UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.

UNITED STATES OF AMERICA,

      Plaintiff,

v.

ONE 1999 135-FOOT BAGLIETTO YACHT,
KNOWN AS M/Y BLUE ICE, OFFICIAL
NUMBER 40146 REGISTERED IN ST. VINCENT
AND THE GRENADINES, IN CURACAO,

APPROXIMATELY $5,999,710.00 IN U.S.
CURRENCY SEIZED ON OR ABOUT
DECEMBER 19, 2017,

APPROXIMATELY $35,488,967.72 IN U.S.
CURRENCY SEIZED ON OR ABOUT
JANUARY 8, 2018,

APPROXIMATELY $4,096,989.74 IN U.S.
CURRENCY RECOVERED ON OR ABOUT
JULY 17, 2018,

REAL PROPERTY LOCATED AT
RESIDENCIAL SANTA MARIA SIGNATURE,
APARTMENTS 9-A AND 9-B, INCLUDING
FIXTURES AND FURNISHINGS, IN PANAMA,
PANAMA,

REAL PROPERTY LOCATED AT
RESIDENCIAL SANTA MARIA SIGNATURE,
APARTMENTS 2-A, 2-B, 3-B, 5-B, 6-B, 7-B, 8-A,
11-A, 11-B,  INCLUDING FIXTURES AND
FURNISHINGS, IN PANAMA, PANAMA,

REAL PROPERTY LOCATED AT
RESIDENCIAL COSTAMARE, APARTMENT
24-011, INCLUDING FIXTURES AND
FURNISHINGS, IN PANAMA, PANAMA,

REAL PROPERTY LOCATED AT
RESIDENCIAL COSTAMARE, APARTMENT
24-021, INCLUDING FIXTURES AND
FURNISHINGS, IN PANAMA, PANAMA,

REAL PROPERTY LOCATED AT VISTAMAR
GOLF VILLAGE, NUMBER 3, INCLUDING
FIXTURES AND FURNISHINGS, IN PANAMA,
PANAMA,

REAL PROPERTY LOCATED AT 18555
COLLINS AVENUE, UNIT 2205, SUNNY ISLES
BEACH, FLORIDA 33160,

ALL ASSETS ON DEPOSIT IN ACCOUNT
NUMBER Z1ULD767 AT VALBURY CAPITAL,
LTD. IN LONDON, UNITED KINGDOM, and

REAL PROPERTY LOCATED AT 2101 SOUTH
SURF ROAD, UNIT 2E, HOLLYWOOD,
FLORIDA,

Defendants *In Rem*.

_____/

## <u>VERIFIED COMPLAINT FOR FORFEITURE *IN REM*</u>

COMES NOW, Plaintiff, the United States of America (the "United States"), by and through its undersigned counsel, to allege upon information and belief as follows:

## I.    NATURE OF THE ACTION

1.      This is a civil action *in rem*, pursuant to 18 U.S.C. § 981(a)(1)(A), (C), and the procedures set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions, the Federal Rules of Civil Procedure, and 18 U.S.C. § 985, to forfeit assets that constitute proceeds of foreign bribery offenses, property involved in money laundering or a conspiracy to commit money laundering, and/or property traceable to such property.  These assets, and their current location, are more fully described as (collectively, the "Defendant Assets"):

(i)     One (1) 1999 135-foot Baglietto yacht, known as the M/Y Blue Ice, official number 40146 registered in St. Vincent and the Grenadines, and in CURACAO;[1]

(ii)    A total of approximately $45,585,667.46 in U.S. currency in the custody of the UNITED STATES, which includes:

    a.    Approximately $5,999,710.00 in U.S. currency seized on or about December 19, 2017;

    b.    Approximately $35,488,967.72 in U.S. currency seized on or about January 8, 2018; and

    c.    Approximately $4,096,989.74 in U.S. currency recovered on or about July 17, 2018;

(iii)   Real property located at Residencial Santa Maria Signature, Apartments 9-A and 9-B, including fixtures and furnishings, in Panama, PANAMA;

(iv)    Real property located at Residencial Santa Maria Signature, Apartments 2-A, 2-B, 3-B, 5-B, 6-B, 7-B, 8-A, 11-A, 11-B, including fixtures and furnishings, in Panama, PANAMA;

(v)     Real property located at Residencial Costamare, Apartment 24-011, including fixtures and furnishings, in Panama, PANAMA;

(vi)    Real property located at Residencial Costamare, Apartment 24-021, including fixtures and furnishings, in Panama, PANAMA;

(vii)   Real property located at Vistamar Golf Village, Number 3, including fixtures and furnishings, in Panama, PANAMA;

---

[1] This asset is the subject of a sealed protective order that was entered on June 24, 2019, in Case No. 18-20685-CR-KMW.  ECF No. 126.

(viii) Real property located at 18555 Collins Avenue, Unit 2205, Sunny Isles Beach, Florida 33160, UNITED STATES;

(ix) All assets on deposit in account number Z1ULD767 at Valbury Capital Ltd. in London, UNITED KINGDOM; and

(x) Real property located at 2101 South Surf Road, Unit 2E, Hollywood, Florida, UNITED STATES.

## II. JURISDICTION AND VENUE

2. This Court has jurisdiction over this subject matter. *See* 28 U.S.C. §§ 1345, 1355(a); 18 U.S.C. § 981(a)(1).

3. This Court has *in rem* jurisdiction over the Defendant Assets. *See* 28 U.S.C. §§ 1345, 1355(a).

4. Venue for this action is proper in this District because acts or omissions giving rise to the forfeiture occurred in the Southern District of Florida, and because this is the same District in which the related criminal prosecution was brought. *See* 28 U.S.C. § 1355(b)(1); 18 U.S.C. § 981(h).

## III. FACTUAL ALLEGATIONS

### A. Introduction

5. At all relevant times, Venezuela had a foreign-currency exchange system under which the Venezuelan government would exchange local currency (bolivars) at a fixed rate for U.S. dollars. The fixed exchange rate had been well below the true economic rate by a substantial factor for several years.

6. For example, in 2014, an individual could exchange $10 million for 600 million Venezuelan bolivars at the true economic rate. If that individual also had access to the government

fixed exchange rate, the individual could convert the same 600 million Venezuelan bolivars into $100 million.  Essentially, in two transactions, that person could buy $100 million for $10 million.

7.     The difference between the fixed rate and the true economic rate created opportunity for fraud and abuse, enabling Venezuelan officials to engage in foreign currency exchange schemes in return for bribes and kickbacks.

8.     Petróleos de Venezuela, S.A. ("PDVSA") was the Venezuelan state-owned oil company.

9.     PDVSA was Venezuela's primary source of income and foreign currency (namely, U.S. dollars and Euros), and consequently, it funded many of the corrupt foreign exchange schemes.

10.    Francisco Convit Guruceaga ("Convit"), Jose Vincente Amparan Croquer ("Amparan"), Carmelo Antonio Urdaneta Aqui ("Urdaneta"), Abraham Edgardo Ortega ("Ortega"), Gustavo Adolfo Hernandez Frieri ("Hernandez Frieri"), Hugo Andre Ramalho Gois ("Gois"), Marcelo Federico Gutierrez Acosta y Lara ("Gutierrez"), Mario Enrique Bonilla Vallera ("Bonilla"), and Matthias Krull ("Krull") conspired with each other and others to launder and engage in monetary transactions with the proceeds of corrupt currency exchange schemes involving PDVSA.

11.    Convit was a Venezuelan national and was often referred to as a "Bolichico," or member of the "boliburgués."

12.    Amparan, also known as "Chente," was a Venezuelan national.

13.    Urdaneta was a Venezuelan national and the legal counsel to the Venezuelan Ministry of Oil and Mining.

14. Ortega was a Venezuela national and the Executive Director of Financial Planning at PDVSA.

15. Hernandez Frieri was born in Colombia and was a naturalized U.S. citizen and resident of Miami, Florida.

16. Gois was a Portuguese national.

17. Krull was a German national and Panamanian resident.

18. Gutierrez was a Uruguayan national.

19. Bonilla was a Venezuelan national.

20. Conspirator 1 was a Venezuelan national and PDVSA official.

21. Conspirator 2 was a Venezuelan national.  Along with Convit, Conspirator 2 was often referred to as a "Bolichico," or member of the "boliburgués."

22. Conspirator 3 was a Venezuelan national and the brother of Conspirator 1.

23. Conspirator 4 was a Venezuelan national and PDVSA official.

24. Conspirator 5 was a Swiss national, and Conspirator 6 was an Argentinian national. Along with Amparan, Conspirator 5 and Conspirator 6 are the directors of European Company 1.

25. Conspirator 7 was a Venezuelan national and the owner of a television network in Venezuela.  Conspirator 7 was also the owner of Eaton Global Services Limited ("Eaton"), a Hong Kong company, as well as Andiron Corp SA ("Andiron").

26. Rantor Capital C.A. ("Rantor") was a Venezuelan shell company.

27. Venezuelan Official 1 was a Venezuelan national and a Vice President of PDVSA.

28. Venezuelan Official 2 was a Venezuelan national and public official.

29. European Company 1 operated as a real estate firm in Madrid, Spain.

30. European Financial Institution 1 operated as a private investment firm in Malta.

6

31.     The confidential source ("CS") was a private asset manager in Latin America.  The CS began cooperating with Homeland Security Investigations in or around April 2016.

32.     Villa del Riposo, S.A. ("Villa del Riposo") was a Panamanian shell company.

33.     Miglior Investimentos, S.A. ("Miglior Investimentos") was a Panamanian shell company.

34.     Global Securities Trade Finance ("GSTF") was a Cayman Islands exempted company with limited liability established on or about May 18, 2006.

35.     Global Securities Advisors GP, LLC ("Global Securities Advisors GP") was a Delaware limited liability company established on or about October 24, 2007.

36.     Global Securities Holdings, LLC ("Global Securities Holdings") was a Florida limited liability company established on or about October 24, 2002, and domiciled in Miami, Florida.

37.     Global Securities Management LLC ("Global Securities Management") was a Florida limited liability company established on or about October 23, 2002, and domiciled in Miami, Florida.

38.     Serfindata S.A. ("Serfindata") was a Colombian company that entered into purported loan agreements with GSTF.

**B. Eaton-Rantor Loan Scheme**

39.     In or around December 2014, PDVSA and Rantor entered into a "loan" contract, which Rantor later assigned to Eaton.

40.     Under the following agreements, Eaton would receive approximately €511 million from PDVSA after only "loaning" PDVSA approximately 7.2 billion Venezuelan bolivars, the market equivalent of approximately €35 million (hereinafter referred to as the "Eaton-Rantor Loan

Scheme"):

 (i) In a <u>loan contract</u> dated on or about December 17, 2014, Rantor agreed to "loan" 7.2 billion Venezuelan bolivars to PDVSA.  The "loan" contract was executed by Venezuelan Official 1 as a Vice President of PDVSA.  Venezuelan Official 1 was a "foreign official" as defined in the Foreign Corrupt Practices Act ("FCPA").

 (ii) In an <u>assignment contract</u> dated on or about December 23, 2014, Rantor assigned its rights as PDVSA's creditor under the "loan" contract to Eaton, and PDVSA was given the right to cancel the debt within 180 days by paying $600 million.

 (iii) In a <u>notice of assignment letter</u> dated on or about  December 23, 2014, Eaton sent a notice of the assignment to PDVSA (*i.e.*, Venezuelan Official 1), and suggested that PDVSA repay the 7.2-billion bolivar loan in the Euro equivalent of $600 million.

41. The division of proceeds from the Eaton-Rantor Loan Scheme was as follows:

 a. Approximately €227 million went to the "Bolichicos" or "Boli" (Convit and Conspirator 2); and

 b. Approximately €227 million Euros went to Conspirator 7.

42. The proceeds were further distributed as follows:

 c. The "Bolichicos" routed approximately €78 million of their €227 million to the CS for further payment to others; and

 d. Conspirator 7 routed approximately €159 million to individuals known as "Los Chamos," the stepsons of Venezuelan Official 2, who was a "foreign official" as defined in the FCPA.

43. On or about May 25, 2015, an addendum to the "loan" contract between Rantor and PDVSA doubled the initial credit line from approximately 7.2 billion Venezuelan bolivars to

approximately 14 billion Venezuelan bolivars.  Consequently, by in or around May 2015, the funds involved in Eaton-Rantor Loan Scheme increased from approximately €511 million to approximately €1 billion, or $1.2 billion.

### C.  Kickback and Bribe Payments to Venezuela Official 1

44.     In exchange for authorizing the "loan," Venezuelan Official 1 received kickback and bribe payments from the proceeds of the Eaton-Rantor Loan Scheme.

45.     Specifically, the CS paid Venezuelan Official 1 a total of approximately $300,000 in two cash payments on or about June 4 and 26, 2015.  This sum was deducted from the balance of the approximately €78 million that had been routed to the CS for further distribution by the "Bolichicos."

46.     Venezuelan Official 1 received these cash payments in exchange for his official acts in facilitating the Eaton-Rantor Loan Scheme, including executing the aforementioned December 17, 2017, contract as a Vice President of PDVSA.

47.     These kickback and bribe payments funded by the proceeds of the Eaton-Rantor Loan Scheme violated not only Venezuelan bribery laws, but also the FCPA because one or more members of the conspiracy engaged in corrupt acts from within the territory of the United States.

48.     In order to conceal and disguise the nature, location, source, ownership, and control of the illicit funds, the members of the conspiracy included an array of straw owners, bankers, and money managers who facilitated the laundering of the proceeds derived from the Eaton-Rantor Loan Scheme and other corrupt schemes involving PDVSA.

### D.  Acquisition of M/Y Blue Ice

49.     Between on or about December 29, 2014, and February 2, 2015, as a result of the Eaton-Rantor Loan Scheme, PDVSA sent a total of approximately €385,216,708.87 via seven wire

9

transfers to accounts held by European Financial Institution 1 for the benefit of Eaton, a company owned and controlled by Conspirator 7.

50.     These Euros were subsequently exchanged for U.S. dollars, and approximately $45 million of the funds initially for the benefit of Eaton were transferred to Andiron, another company owned and controlled by Conspirator 7.

51.     Between on or about September 29, and December 4, 2015, more than $3 million traceable to the Eaton-Rantor Loan Scheme was transferred from European Financial Institution 1 to a yacht sales company in Miami, Florida (the "Yacht Company") in the following wires:

(i)     On or about September 29, 2015, approximately $541,614 was transferred from European Financial Institution 1 to the Yacht Company, with the wire transfer details stating "INV GP 1415 + DEPOSIT;"

(ii)     On or about December 1, 2015, approximately $1,000,000 was transferred from European Financial Institution 1 to the Yacht Company, with the wire transfer details stating "CONTRACT DD 10/09/2015;" and

(iii)     On or about December 8, 2015, approximately $1,500,000 was transferred to the Yacht Company, with the wire transfer details stating "CONTRACT DD 09/10/2015."

52.     Then, in or around December 2015, a total of approximately $3,132,000 was transferred or withdrawn in five transactions from the Yacht Company's account to fund the purchase of one (1) 1999 135-foot Baglietto yacht, known as the M/Y Blue Ice, official number 40146 registered in St. Vincent and the Grenadines ("M/Y Blue Ice").  The details for each of these transactions referenced "135 BAGLIETTO" or payments for "BAGLIETTO BLUE ICE."

53.     A Yacht Company representative confirmed that the M/Y Blue Ice was acquired for Conspirator 7's brother-in-law.  He also confirmed that the two transfers on or about December 1 and 8, 2015, from European Financial Institution 1 funded the purchase of M/Y Blue Ice.

**E. Laundering of Proceeds for Urdaneta, Seized Funds, and Acquisition of Panama Real Properties, Porsche Design Tower Unit, and Valbury Account**

54.     Between on or about January 14, and February 12, 2015, a total of approximately €78,876,101.07 traceable to proceeds from the Eaton-Rantor Loan Scheme was transferred, in three transactions from European Financial Institution 1, to an account held by the trustee of the CS's trust.  Such funds were subsequently transferred to other accounts owned or controlled by the CS.

55.     The CS was tasked with laundering these illicit proceeds for the benefit of not only Venezuelan Official 1 (as described above in paragraphs 44 to 48), but also for the benefit of Conspirator 1, Conspirator 3, Urdaneta, and Ortega.

56.     Starting in or around January 2015, in recorded conversations and BlackBerry Messenger chats, Convit and Urdaneta discussed the CS's receipt of such funds, and instructed the CS on how to handle the funds.  Convit was present in the Southern District of Florida during certain of these communications.

57.     Of the illicit proceeds transferred to the CS, the United States eventually took custody of a total of approximately $45,585,667.46.

58.     Specifically, on or about December 19, 2017, and January 8, 2018, respectively, the United States seized approximately $5,999,710.00 and approximately $35,488,967.72 from the CS, who had been holding these funds for the benefit of Urdaneta.

59.     On or about July 17, 2018, the CS turned over to the United States the remaining funds in his possession related to the Eaton-Rantor Loan Scheme, approximately $4,096,989.74.

60.     By then, Urdaneta had already directed the CS to launder and spend a significant portion of Urdaneta's share of the Eaton-Rantor Loan Scheme proceeds, including by funding the acquisition of real property in Panama.

61.     For instance, on or about April 28, 2015, a contract was executed at the direction of Urdaneta for Villa del Riposo, a Panamanian shell company, to purchase Apartments 9-A and 9-B at the Residencial Santa Maria Signature in Panama for a total of approximately $1,900,000.

62.     Approximately €1,753,969.35 in the CS's custody was exchanged for approximately $1,900,000 to fund the purchase of Apartments 9-A and 9-B.

63.     On or about May 12, 2015, a contract was executed at the direction of Urdaneta for Miglior Investimentos, a Panamanian shell company, to purchase Apartments 2-A, 2-B, 3-B, 5-B, 6-B, 7-B, 8-A, 11-A, and 11-B at the Residencial Santa Maria Signature in Panama for a total of approximately $9,500,000.

64.     On or about May 22, 2015, approximately $9,501,021.42 was transferred from an account controlled by the CS to fund the purchase of Apartments 2-A, 2-B, 3-B, 5-B, 6-B, 7-B, 8-A, 11-A, and 11-B.

65.     On or about July 19, 2016, contracts were executed at the direction of Urdaneta for Miglior Investimentos to purchase Apartment No. 24-021 for a $300,000 and Apartment No. 24-011 for a $310,000, both located at Residencial Costamare in Panama.

66.     On or about October 4, and November 16, 2016, approximately $300,020 and approximately $310,020, respectively, were transferred from an account controlled by the CS to fund the purchase of Apartment Nos. 24-021 and 24-011.

67.     On or about December 1, 2016, a contract was executed at the direction of Urdaneta for Miglior Investimentos to purchase Number 3 at Vistamar Golf Village in Panama for $900,000.

68.     On or about January 5, 2017, approximately $900,020 was transferred from an account controlled by the CS to fund the purchase of Number 3.

69.     In addition, at the instruction of Urdaneta, the CS met with others, including Amparan in Miami, Florida, to discuss other efforts to launder Urdaneta's share of the proceeds from the Eaton-Rantor Loan Scheme.

70.     In a meeting on or about April 27, 2016, which was recorded, Amparan explained to the CS that Amparan would launder Urdaneta's proceeds using a fraudulent bond that would default in order to conceal the transfer of funds.

71.     In subsequent communications, including a recorded phone call on or about May 17, 2016, Urdaneta informed the CS that Urdaneta had paid a significant deposit for Unit 2205 at the Porsche Design Tower, which is located at 18555 Collins Avenue, Sunny Isles Beach, Florida 33160.  Urdaneta discussed titling Unit 2205 in the name of a company to conceal Urdaneta's interest, and transferring the property to Amparan as a fee for Amparan's laundering services.

72.     On or about May 18, 2016, during a recorded meeting, Amparan and the CS also discussed using Urdaneta's condominium unit as Amparan's fee for laundering services.

73.     According to online records on Florida's Division of Corporations website, on or about May 26, 2016, Paladium Real Estate Group, LLC ("Paladium") was established as a Florida limited liability company.  The articles of organization named Urdaneta's wife and another individual as the company's managers.

74.     A company resolution for Paladium dated September 16, 2016, appointed Amparan's relative, as the sole manager of Paladium.  On or about September 25, 2016, Paladium publicly filed an amendment to its articles of organization, removing Urdaneta's wife as a manager and adding Amparan's relative as a manager.

75.     On or about December 22, 2016, Urdaneta's wife assigned her interest in Unit 2205 to Paladium, a Florida limited liability company.  According to the assignment agreement, Urdaneta's wife and another individual were the sole members of Paladium, with a 51 percent and a 49 percent interest in the company, respectively.

76.     On or about January 12, 2017, title to Unit 2205 at the Porsche Design Tower was transferred to Paladium via special warranty deed.

77.     Urdaneta also directed the CS to meet with Gois to discuss how to launder another portion of Urdaneta's share of the Eaton-Rantor Loan Scheme proceeds.

78.     On or about March 1, 2017, the CS met with Urdaneta, Amparan, Gois, and Conspirator 5 at the offices of European Company 1 in Madrid, Spain.

79.     During the meeting, which was recorded, Gois explained that in order to conceal the transfer of funds to Urdaneta, the CS should buy a U.K. gilt to transfer to an account at Valbury Capital Ltd. in London, where the U.K. gilt would be swapped with a fake bond.  A gilt is a government bond issued by the United Kingdom.

80.     On or about April 26, 2017, the CS, at the request of Gois and Urdaneta, purchased a £5 million U.K. gilt with funds traceable to the Eaton-Rantor Loan Scheme.

81.     On or about June 20, 2017, at the direction of Gois, the CS ordered that the U.K. gilt be free delivered to account number Z1ULD767 at Valbury Capital Ltd. in London, United Kingdom.

### F.  Laundering of Proceeds for Ortega and Sage Beach Unit 2E

82.     Aside from Urdaneta, the CS was also instructed to launder funds for Ortega.  After the CS's receipt of the approximately €78 million traceable to proceeds of the Eaton-Rantor Loan Scheme, Conspirator 1 and Conspirator 3 told the CS to assign $5 million of their share of the

funds to Ortega.

83.     The CS, through another company, was already managing an additional $7 million that belonged to Ortega.  These funds were not proceeds of the Eaton-Rantor Loan Scheme, but derived from another illicit scheme at PDVSA.

84.     As a result, in early 2016, the CS controlled a total of approximately $12 million for Ortega's benefit.

85.     On or about April 2, 2016, during a recorded meeting, Hernandez Frieri explained to the CS and Ortega that his brokerage firm, which was headquartered in Miami, Florida and operated in the United States and Latin America, received payments made to look like investments into a fund, only to launder such payments out of that fund.

86.     Under this scheme, as explained by Hernandez Frieri, Ortega's funds would be transferred from the CS's custody to accounts managed and controlled by Hernandez Frieri.  The transfer would be justified as a subscription in an investment fund managed by Hernandez Frieri's firm.

87.     Because a financial institution makes such investments as a nominee on behalf of its underlying client, the bank would appear to hold the shares on the subscription paperwork, thereby concealing Ortega's ownership.

88.     Once "invested," the illicit proceeds could then be transferred to accounts that could be accessed by Ortega.

89.     In furtherance of this laundering scheme, on or about May 5, 2016, Hernandez Frieri sent, via e-mail, a fund subscription agreement for GSTF, a fund Hernandez Frieri controlled.  The subscription agreement directed that payment be made by wire transfer to an account at City National Bank in New Jersey, held in the name of GSTF.

90.     According to an investment management agreement, Global Securities Advisors, LLC was the "investment manager" for GSTF.   In other documentation, however, Global Securities Advisors GP, a different entity, was referenced as the "investment manager" for GSTF.

91.     According to a notarized document submitted to GSTF's fund administrator, Global Securities Advisors GP was 100 percent owned by Global Securities Holdings, a Florida limited liability company.  According to online records on Florida's Division of Corporations website, as of in or around October 2018, "Cesar Hernandez" was Global Securities Holdings' registered agent and manager.

92.     At the direction of Ortega and Hernandez Frieri, on or about May 26, 2016, the CS caused the transfer of approximately $7 million to an account number ending in 5724 at City National Bank, which was subsequently transferred on or about May 31, 2016, to an account number ending in 6054 held by GSTF ("GSTF CNB Account 6054").

93.     In addition, on or about January 21 and February 21, 2017, Hernandez Frieri sent, via e-mail, GSTF subscription agreements to the CS with respect to Ortega's remaining $5 million in the CS's custody.  On or about February 28, 2017, approximately $5 million was transferred to GSTF CNB Account 6054, which was subsequently transferred on or about May 24, 2017, to an account at City National Bank ending in 2421 held by GSTF.

94.     A total of approximately $120,000 traceable to these illicit proceeds was used to fund the purchase of Unit 2E at the Sage Beach condominium, which is located at 2101 South Surf Road, Hollywood, Florida.

95.     Specifically, on or about April 3, 2017, approximately $30,000 was transferred from GSTF CNB Account 6054  to an account ending in 7276 at Wells Fargo Bank ("GSM WF Account 7276") held in the name of Global Securities Management, a Florida limited liability

company.  According to financial records, the sole signatory of GSM WF Account 7276 was Cesar Hernandez Jr.

96.     On or about April 18, 2017, approximately $30,000 was transferred from GSM WF Account 7276 to a trust account for the purchase of Unit 2E at the Sage Beach.

97.     On or about April 19, 2017, approximately $90,000 was transferred from GSTF CNB Account 6054 to GSM WF Account 7276.

98.     On the same day, on or about April 19, 2017, approximately $86,119.83 was transferred from GSM WF Account 7276 to a trust account for the purchase of Unit 2E of the Sage Beach.

99.     The $30,000 transfer to GSM WF Account 7276 was characterized as a "structuring fee" for Serfindata, a Colombian company, while the $90,000 transfer was a "loan" from GSTF to Global Securities Management.

100.    On or about March 27, 2017, Serfindata, as borrower, and GSTF, as lender, had purportedly entered into a $1-million loan agreement, which was executed on behalf of GSTF by Hernandez Frieri as its director.  The loan agreement, as amended on or about June 29, 2017, contemplated a maturity date six months from disbursement on which principal plus a 10-percent interest rate would be repaid to GSTF CNB Account 6054.  The agreement also contemplated the payment of structuring fees.  This loan was not fully repaid.

101.    Similarly, on or about April 17, 2017, Global Securities Management, as borrower, and GSTF, as lender, had purportedly entered into a $90,000 loan agreement, which was executed by Cesar Hernandez Jr. on behalf of Global Securities Management and Hernandez Frieri on behalf of GSTF.  The loan agreement contemplated a maturity date one month after disbursement on which principal and 8-percent interest would be repaid to GSTF CNB Account 6054.  This loan

was not fully repaid.

102.    According to closing documents, on or about April 14, 2017, title to Unit 2E was transferred to LAND TRUST TH 041117 dated April 10, 2017, after receipt of approximately $120,000 traceable to Ortega's $7 million in illicit proceeds, as well as an additional $900,000 on escrow at a title insurance company.

103.    Based on trust documents, Tulia Eugenia Hernandez was the trustee of LAND TRUST TH 041117, and she and Cesar Gabriel Hernandez were the settlors and grantors.

104.    Tulia Eugenia Hernandez was Hernandez Frieri's sister-in-law, and Cesar Gabriel Hernandez was Hernandez Frieri's brother.  They were the parents of Cesar Hernandez Jr.

### G.  Federal Criminal Cases

105.    On August 15, 2018, a federal grand jury in the Southern District of Florida returned an Indictment charging Convit, Amparan, Urdaneta, Ortega, Hernandez Frieri, Gois, Gutierrez, and Bonilla with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B) and 1956(a)(2)(A), and interstate and foreign travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3).  *See United States v. Convit et al.,* Case No. 18-20685-CR-KMW.

106.    A Superseding Information was later filed charging Ortega with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  Ortega pleaded guilty to conspiracy to commit money laundering on October 31, 2018.

107.    On August 16, 2018, an Information in a separate case was filed charging Krull with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).  *See United States v. Krull*, Case No. 18-20682-CR-CMA.  Krull pleaded guilty to conspiracy to commit money laundering, and was sentenced on October 29, 2018.

108.    On May 3, 2019, Hernandez Frieri made an initial appearance, and his arraignment was subsequently held.

109.    Convit, Amparan, Urdaneta, Gois, Gutierrez, and Bonilla have not made an initial appearance, and the criminal case against them has been transferred to fugitive status.

## IV.   BASIS FOR FORFEITURE

110.    Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956 and 1957], or any property traceable to such property" is subject to forfeiture to the United States.

111.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . any offense constituting 'specified unlawful activity' . . . , or a conspiracy to commit such offense" is subject to forfeiture to the United States.

112.    Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is a federal crime to, "knowing that the property involved in a transaction represents the proceeds of some form of unlawful activity, conduct[] or attempt[] to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . .  to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity."

113.    Pursuant to 18 U.S.C. § 1956(a)(2)(A), it is a federal crime to "transport[], transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States . . . with the intent to promote the carrying on of specified unlawful activity."

114.     Pursuant to 18 U.S.C. § 1956(a)(2)(B)(i), it is a federal crime to "transport[],
transmit[], or transfer[], or attempt[] to transport, transmit, or transfer a monetary instrument or
funds from a place in the United States to or through a place outside the United States or to a place
in the United States from or through a place outside the United States . . . knowing that the
monetary instrument or funds involved in the transportation, transmission, or transfer represent the
proceeds of some form of unlawful activity and knowing that such transportation, transmission, or
transfer is designed in whole or in part . . .  to conceal or disguise the nature, the location, the
source, the ownership, or the control of the proceeds of specified unlawful activity."

115.     Pursuant to 18 U.S.C. § 1957, it is a federal crime to "knowingly engage[]or
attempt[] to engage in a monetary transaction in criminally derived property of a value greater than
$10,000 and is derived from specified unlawful activity."

116.     Pursuant to 18 U.S.C. § 1956(h), it is a federal crime to conspire to commit any
offense in violation of 18 U.S.C. § 1956 or 1957.

117.     A "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(B)(iv) to
include, among other things: (i) with respect to a financial transaction occurring, in part, in the
United States, a foreign offense involving bribery of a public official, and the misappropriation,
theft, or embezzlement of public funds by or for the benefit of a public official; and (ii) a felony
violation of the FCPA.

118.     Bribery of a public official is a criminal offense in Venezuela under the Law
Against Corruption.

119.     Pursuant to the FCPA, 15 U.S.C. § 78dd-3, it is a federal crime "corruptly to make
use of the mails or any means or instrumentality of interstate commerce or to do any other act in
furtherance of an offer, payment, promise to pay, or authorization of the payment of any money,

or offer, gift, promise to give, or authorization of the giving of anything of value to . . . any foreign official for purposes of . . . influencing any act or decision of such foreign official in his official capacity, . . . inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official, or . . . securing any improper advantage; or . . . inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist such person in obtaining or retaining business for or with, or directing business to, any person."

120.    A violation of 18 U.S.C. § 1952 is also a "specified unlawful activity," pursuant to 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1).  Pursuant to 18 U.S.C. § 1952(a), it is a federal crime to "travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to . . . distribute the proceeds of any unlawful activity; . . . or otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity."

**FIRST CLAIM**
**Proceeds of Foreign Bribery Offenses**
**(18 U.S.C. § 981(a)(1)(C))**

121.    The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

122.    As set forth above, the Defendant Assets constitute or were derived from proceeds traceable to a foreign offense involving bribery of a public official that occurred, in part, in the United States, and/or a conspiracy to commit such offense.

123.    Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM
**Property Involved in Money Laundering Conspiracy**
**(18 U.S.C. § 981(a)(1)(A))**

124.    The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

125.    As set forth above, the Defendant Assets were involved in transactions or attempted transactions in a conspiracy to commit an offense in violation of 18 U.S.C. § 1956 or 1957, and/or constitute property traceable to such property.

126.    Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM
**Property Involved in Concealment Laundering Transactions**
**(18 U.S.C. § 981(a)(1)(A))**

127.    The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

128.    As set forth above, the Defendant Assets were involved in transactions or attempted transactions designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or control of proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and/or constitute property traceable to such property.

129.    Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM
**Property Involved in International Promotional Laundering Transactions**
**(18 U.S.C. § 981(a)(1)(A))**

130.    The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

131.     As set forth above, the Defendant Assets were involved in transactions or attempted transactions of a monetary instrument or funds from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, with the intent to promote the carrying on of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(A), and/or constitute property traceable to such property.

132.     Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### FIFTH CLAIM
**Property Involved in International Concealment Laundering Transactions**
**(18 U.S.C. § 981(a)(1)(A))**

133.     The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

134.     As set forth above, the Defendant Assets were involved in transactions or attempted transactions from a place in the United States to or through a place outside the United States, or to a place in the United States from or through a place outside the United States, that were designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity in violation of 18 U.S.C. § 1956(a)(2)(B)(i), and/or constitute property traceable to such property.

135.     Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### SIXTH CLAIM
**Property Involved in Laundering Transaction Greater Than $10,000**
**(18 U.S.C. § 981(a)(1)(A))**

136.     The factual allegations in paragraphs 1 to 120 are re-alleged and incorporated by reference herein.

137.    As set forth above, the Defendant Assets were involved in transactions in property of a value greater than $10,000 that was derived from specified unlawful activity in violation of 18 U.S.C. § 1957, and/or constitutes property traceable to such property

138.    Accordingly, the Defendant Assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

**WHEREFORE**, Plaintiff, the United States of America, requests that this Honorable Court issue warrants for the arrest of the Defendant Assets; that notice of this action be provided to persons known or thought to have an interest in or right against the Defendant Assets; that the Defendant Assets be forfeited and condemned to the United States of America; and for such other and further relief as this Court may deem just, necessary and proper.

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

By:    */s/ Danielle Croke*
Danielle Croke
Assistant United States Attorney
Fla. Bar No. 0723258
Danielle.croke@usdoj.gov
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (561) 209-1035
Facsimile: (561) 655-9785

*/s/ Nicole Grosnoff*
Nicole Grosnoff
Assistant United States Attorney
Court ID No. A5502029
Nicole.s.grosnoff@usdoj.gov
U.S. Attorney's Office
99 Northeast Fourth Street, 7th Floor
Miami, Florida 33132-2111
Telephone: (305) 961-9294
Facsimile:  (305) 536-4089

24

## **VERIFICATION**

I, ALAN G. VEGA, hereby verify and declare, under penalty of perjury, that I am a Special Agent with Homeland Security Investigations ("HSI") and that the foregoing factual allegations are true and correct to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent of HSI.

Executed on this 15 of October 2019.

ALAN G. VEGA
Special Agent, Homeland Security Investigations