UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 19-cv-24249-KMW

UNITED STATES OF AMERICA,

 v.

ONE 1999 135-FOOT BAGLIETTO YACHT,
etc., et al.
_____/

## CLAIMANT MTGP135LTD'S MOTION TO DISMISS

   This Court should dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(6) and Supplemental Rules G(2) and E(2)(a) for lack of jurisdiction, insufficient pleading, and failure to state a claim. Specifically, this Court lacks jurisdiction over the *in rem* defendant yacht because it is located abroad in another sovereign's territory, has not been seized or otherwise placed under the control of this Court, and is now the subject of a judgment of a foreign court, depriving this Court of *in rem* subject matter jurisdiction. Further the Complaint fails to allege a valid forfeiture claim against the defendant, and requires a more definite statement to do so

   The Complaint asks this Court to exercise *in rem* jurisdiction to enter a forfeiture judgment against a yacht located in Curacao, not in the United States. This Court lacks the power, under Article III and the Due Process Clause, to establish title to a yacht docked in Curacao. Complaint, ¶ 1(i) (a yacht "known as the M/Y Blue Ice, official number 40146 registered in St. Vincent and the Grenadines, and in CURACAO."). Even if this Court had *in rem* jurisdiction over the defendant yacht, the Complaint fails to allege a legal basis to forfeit the defendant.

## The Complaint

   In substance, the Complaint alleges that the defendant yacht was purchased with monies transferred from Venezuela in January 2015 to a "European Financial Institution 1," based upon a Venezuelan government currency contract. Complaint, ¶ 52. In 2014, the Venezuelan government entered into a loan contract with a Venezuelan lender named Rantor Capital, the rights to which were assigned to a Hong Kong company Eaton. Complaint, ¶¶ 26, 39-43. The Complaint acknowledges that the loan to the Venezuelan government was made to the Venezuelan government's largest source of foreign currency, its oil company PDVSA, in 2014 under the Venezuelan government's existing currency exchange system. *Id.*, ¶ 5 ("Venezuela had a foreign-

currency exchange system under which the Venezuelan government would exchange local currency (bolivars) at a fixed rate for U.S. dollars . . . well below the true economic rate by a substantial factor for several years.").

Under this Venezuelan government currency exchange system, lenders could receive loan repayments from PDVSA at allegedly inflated currency rates, providing a substantial financial premium (10 to 1) return to lenders, in exchange for providing foreign currency liquidity to the Venezuelan government. *Id.*, ¶ 7. This premium was possible, and was obtained here, by PDVSA's early repayment of its loan in January and February 2015. *Id.*, ¶ 54. By February 12, 2015, then, the PDVSA had repaid its loan in full, at which time the alleged proceeds of the loan repayment were transferred to "European Financial Institution 1."

The Complaint attempts, but fails, to associate these loan repayment monies with an alleged later $300,000 bribe of a Venezuelan public official (*id.*, ¶ 45) that took place in Venezuela in June 2015 to "facilitate" the alleged scheme it now dubs as the "Eaton-Rantor Loan Scheme." Complaint, ¶¶ 39-43. The Complaint does not allege that this 2014 contract was the product of any bribery and it only takes issue with the fact that there is a comparative advantage to Venezuelan government contracts on the foreign exchange markets. Hence, whatever value was created by Venezuelan government-induced market discrepancies in foreign currency exchanges, they applied to the 2014 contract like all others. This 2014 contract is not alleged to be itself procured by bribery. Instead, the Complaint alleges that, in June 2015, the Government's Confidential Source ("CS") paid two "kickback and bribe payments" totaling $300,000 to a Venezuelan public official (Official 1). Complaint, ¶ 45.

Critically, all aspects of the alleged "Eaton-Rantor Loan Scheme" took place in Venezuela. The person alleged to have made the bribe payment in June 2015--"CS" (*id.*, ¶ 45)—is only identified as a "private asset manager in Latin America," who took custody of the alleged loan proceeds. *Id.*, ¶ 54. CS allegedly began cooperating with the Homeland Security in April 2016, *id.*, ¶ 31, but is the sole source of the substantial monies seized for forfeiture in late 2017 and early 2018. *Id.*, ¶¶ 57-59.

The Complaint alleges that the Eaton-Rantor loan proceeds are the product of antecedent violation of the Foreign Corrupt Practices Act ("FCPA"). *Id.*, ¶ 119 (citing 15 U.S.C. § 78dd-3). More particularly, the Complaint alleges that the alleged foreign bribery constitutes the "specified unlawful activity" that allegedly transformed the government loan repayments into money

laundering proceeds (Complaint, ¶¶ 117-20), suitable for forfeiture under 18 US.C. § 981(a)(1)(C) (Count 1). Complaint, ¶¶ 47, 122 (bribe payments "violated not only Venezuelan bribery laws, but also the FCPA because one or more members of the conspiracy engaged in corrupt acts from within the territory of the United States").  As further discussed below, this fails to state a FCPA violation.

The bulk of the Complaint makes numerous factual allegations about third parties and unrelated properties, including trying to criminalize how investment firms commonly hold securities on behalf of their clients (*id.*, ¶ 87), none of which are material to the defendant yacht. The sparse allegations about the defendant yacht (*id.*, ¶¶ 51 & 52) relate to its purchase in December 2015.  The Complaint does not allege that CS purchased the yacht or transferred the monies to do so. Instead, the Complaint offers the conclusory claim that because monies used in its purchase came from "European Financial Institution 1," they were "traceable to the Eaton-Rantor Loan Scheme." This has relevance because the transfer of alleged "proceeds" to the European Financial Institution, upon which the Complaint is bottomed, was alleged to have occurred over the month period from January 14th and February 12th, 2015. Complaint, ¶ 54. There is nothing inherently illegal about transferring the proceeds of a Venezuelan contract to a European Financial Institution. This transaction would have occurred *after* the contract and its December 2014 assignment to the Eaton company but *before* the alleged June 2015 kickback allegedly undertaken by the Confidential Source.

The Complaint alleges that, upon the transfer of these monies to the European Financial Institution in January and February 2015 ("approximately E78,876,1010.07"), "CS was tasked with laundering these illicit monies for the benefit of" various individuals. This allegation assumes its own conclusion because, as of February, 2015, the alleged kickback had yet to occur; rendering the government loan repayment monies sent to the European Financial Institution not the proceeds of a bribe, a kickback, or an FCPA violation.

The Complaint does allege that the subsequent mid-2015 cash payments to Official 1 were for "facilitating" the "aforementioned December 17, **2017** contract as a Vice President of PDVSA." Complaint, ¶ 46 (emphasis added).  But this is an obvious error because the only December 17th contract in the Complaint (aforementioned or not) is that of December 17, **2014**. *Id.*, ¶ 1(i) (emphasis added). The source (CS) of this information is the briber/kick-backer himself. *Id.*, ¶ 45. He is also the Complaint's tasked and designated money launderer of the proceeds of the alleged "Eaton-Rantor Loan Scheme." *Id.*, ¶ 54-55.  He should a reliable source on when he made

his $300,000 in payment to the Venezuelan official. Moreover, he "began cooperating with Homeland Security Investigations in or around April 2016," shortly after these events. *Id.*, ¶ 31.

The Complaint alleges that the defendant yacht is subject to civil forfeiture under 18 U.S.C. §§ 981(a)(1)(A) & (C) as property "involved in" money laundering (A), or proceeds traceable to the specified unlawful activity of a FCPA violation, (C). Complaint, ¶ 1. *See* First Claim (foreign bribery proceeds under § 981(a)(1)(C)) and Claims Two through Six (involved in property under § 981(a)(1)(A)). The alleged "specified unlawful activity" upon which the money laundering is predicated is alleged bribery of a Venezuelan official. Complaint, ¶¶117-119.

The Complaint makes no allegation that the defendant yacht was itself involved in a money laundering transaction. Instead, the Complaint appears to limit the forfeiture claim to the yacht being a traceable proceed. Nonetheless, the Complaint lacks any allegation that the yacht is the product of any laundering concealment design or calculus by CS, by the European Financial Institution, or by anyone else.

In turn, Supplement Rule G(3) specifies the procedures and process that the Government must obtain and execute in order to "arrest the property" so as to confer *in rem* jurisdiction upon this Court. Rule G(3)(b)(i) specifies that the clerk must issue an arrest warrant if the defendant "is in the government's, possession, custody, or control," with Rule G(3)(b)(ii) requiring a court finding of probable cause to "issue a warrant to arrest the property if it is not in the government's possession, custody, or control, and is not subject to a judicial restraining order." *Accord*, *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 84 (1992) ("Certainly, it long has been understood that a valid seizure of the res is a prerequisite to the *initiation* of an *in rem* civil forfeiture proceeding.") (emphasis in the original; citing cases); *Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 969 n.22 (11th Cir. 2012) (quoting this holding from *Republic Nat'l Bank*); *Scarabin v. DEA*, 966 F.2d 989, 993 (5th Cir. 1992) ("Thus, like a court entertaining an *in rem* action, the federal agency undertaking the administrative forfeiture proceeding must have physical control over the property to be forfeit."). The Eleventh Circuit has consistently held that "'[o]nly if the court has exclusive custody and control over the [*res*] does it have jurisdiction over the [*res*] so as to be able to adjudicate rights in it that are binding against the world.'" *Alderwoods*, 682 F.3d at 969 (quoting *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 657 F.3d 1159, 1171 (11th Cir. 2011)).

The government has satisfied none of these requirements here. The Complaint makes no claim about the location, seizure, or custody of the defendant yacht. The Complaint makes no allegation that Plaintiff has taken possession of or otherwise placed the defendant yacht under the custody or control of the government or of this Court. Likewise, there has been no claim that the defendant yacht has been arrested, that a warrant has been issued for its arrest or that the defendant yacht has received any process from this Court. *See, e.g., Attkisson v Holder*, 925 F.3d 606 (4th Cir. 2019) (describing "the principle that a court generally lacks personal jurisdiction over unserved parties.) *See, e.g.*, *Koehler v. Dodwell*, 152 F.3d 304, 306 (4th Cir. 1998).

The Complaint alleges that this Court has *in rem* jurisdiction under 28 U.S.C. §§ 1345 and 1335(a). Complaint, ¶ 3. However, neither provision provides this Court with *in rem* jurisdiction, and as just noted, the Government has taken no steps to secure this Court's *in rem* jurisdiction with process.

On the merits, the Complaint purports to base its yacht forfeiture claim upon events and financial transactions that took place in Venezuela and Europe in 2014 and early 2015. *Id.*, ¶¶ 49-53. The Complaint alleges that during this period, the Venezuelan oil company (PDVSA) transferred 385 million euros to a "European Financial Institution," and that from September to December, 2015 this European Financial Institution transferred "more than $3 million" to a Miami Yacht Company. *Id.*, ¶ 51. Then, in December 2015, the Miami Yacht Company transferred $3,132,000 from an unidentified location to an unidentified location to purchase the defendant yacht at an unidentified location. *Id.*

The balance of the predicate offenses appears to be efforts to criminalize post-bribery financial transactions as being the transportation of proceeds (§ 1956(a)(2)(A)), transactions to conceal proceeds (§ 1956(a)(1)(B)(i)), or the transportation of proceeds to conceal proceeds. § 1956(a)(2(B)(j). Complaint, ¶¶ 112-14.

### The Pleading Standards Applicable to the Complaint

Two sets of pleading standards apply to civil forfeiture complaints: the plausibility standard of Fed. R. Civ. P. 8; or the heightened *in rem* forfeiture pleading standards specifically set forth in Supplemental Civ. P. Rule G(2) and E(2)(a).[1] Claimant respectfully submits that both standards

---

[1] Even before the Supreme Court announced the plausibility pleading standard, courts held civil forfeiture complaints to a heightened pleading standard in recognition of the drastic nature of their procedures and results. *See United States v. $39,000 in Canadian Currency*, 801 F.2d

apply with neither satisfied here.[2] *United States v. $134,972 Seized from FNB Bank*, 94 F.Supp.3d 1224, 1239 (N.D. Ala. 2015) (heightened Rule G(2) standard applies); *United States v. $3,168,400 in U.S. Currency*, 2017 WL 10591752, *3 (C.D. Calif. Dec. 5, 2017) (heightened standard applies beyond *Iqbal/Twombly* standard to complaint under 18 U.S.C. § 981(a)(1)(A) & (C)).

Initially, a civil forfeiture must satisfy the Supplemental Rules for Admiralty and Maritime Claims, 18 U.S.C. § 983(a)(3)(A), including Supplemental Rule E(2)(a) which requires that "a complaint shall state the circumstances from which the claim arises with such particularity that the defendant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." As the 11th Circuit has held, the "rule contains no exceptions to this requirement." *United States v. $38,000 in U.S. Currency,* 816 F.2d 1538, 1548 (11th Cir. 1987) (dismissing complaint under Rule E(2)). This requires a complaint to state sufficient facts to support a reasonable belief that the property is subject to forfeiture—here, that is has a substantial connection to the cited offense. *Id*. Where, as here, the government claims that deposits into an account constitute money laundering, it must allege facts to show that the deposits are of criminal proceeds. *United States v. $1,399,313.74 in U.S. Currency,* 591 F.Supp.2d 365, 374 (S.D.N.Y. 2008) (conclusory allegations insufficient).

Second, a civil forfeiture complaint must comply with the minimum plausibility-in-pleading standards of Fed. R. Civ. P. 8 described by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007). Fed. R. Civ. P. Supp. A(2). *United States v. Any and All Ownership Interest Held in the Name*, 2020 WL 278762, *4 (D.N.J. Jan. 16, 2020). Under that standard, "the Government must at a minimum allege a plausible connection between the underlying offenses and the relevant property." *Id.* at *11. Also, under the plausibility standard, conclusory allegations must be disregarded as insufficient to allege a plausible claim, especially those which simply recite formulaic elements of a claim. *Twombly*, 550 U.S. at 555 (applied in *United States v. $40,000 in U.S. Currency*, 2010 WL 2330353, *1 (W.D.N.C. May 11, 2010), *adopted*, 2010 WL 2330352 (W.D.N.C. June 7, 2010)); *accord Jackson v. JPay Corp.*, 2020 WL 5264514, *1 (S.D. Fla. July 27, 2020). Furthermore, under the Civil Rule pleading standards,

---

1210, 1218 (10th Cir. 1986) ("The drastic nature of admiralty and forfeiture remedies requires heightened protections not present in general civil practice.").

[2] The sufficiency of a forfeiture complaint is subject to a Rule 12 motion to dismiss prior to the filing of an answer. *United States v. $8,221,877.16*, 330 F.3d 141, 153 (3rd Cir. 2003).

fraud must be pled with particularity, Fed. R. Civ. P. 9(b), and the Complaint purports to allege both foreign bank fraud (Complaint, ¶¶ 65, 66, 76, 107, 116) and the international transportation of fraudulently obtained monies (*Id.*, ¶¶ 160, 163).

Here, the majority of the factual allegations in the Complaint are not about the yacht or its purchase, but rather concentrate upon alleged misconduct in Venezuela. More directly, the allegations in Claims One through Seven of the Complaint are classic examples of formulaic pleading recitations of statutory elements devoid of any facts, except those that can be imagined to lurk within the set of common facts, most of which have nothing to do with the defendant yacht.

The plausibility standard carries with it the statutory requirement that the government labors under the preponderance standard of proof imposed in 2000 with the Civil Asset Forfeiture Reform Act.[3] Among other requirements, a civil forfeiture complaint must adequately allege the elements of the claimed criminal offense.

Third, the applicable pleading rules of Supplemental Rule G(2) are more exacting still. Emphasizing those requirements germane to this Complaint, Supplemental Rule G(2) states that a civil forfeiture complaint must:

(a) be verified;

(b) *state the grounds for subject-matter jurisdiction,* in rem *jurisdiction over the defendant property, and venue*;

(c) describe the property with reasonable particularit*y*;

(d) *if the property is tangible, state its location when any seizure occurred and— if different—its location when the action is filed*;

(e) identify the statute under which the forfeiture action is brought; and

(f) *state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.*

(emphasis added). On the last requirement, the statutory burden of proof imposed upon the government at a trial is proof that the property is subject to forfeiture. 18 U.S.C. § 983(c). Further, where, as here, the Government claims that the defendant property is forfeitable because it was

---

[3] *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 909 (7th Cir. 2016) ("'[T]he existence of money or its method of storage are not enough to establish probable cause for forfeiture,' much less enough to meet the now-heightened standard of a preponderance of the evidence.") (quoting *United States v. $506,231 in U.S. Currency*, 125 F.3d 442, 445 (7th Cir. 1997)).

"involved in" the offense (*see, e.g.*, 18 U.S.C. § 981(a)(1)(a); Complaint, ¶¶ 1, 110, 112)), the Government "shall establish that there was *a substantial connection* between the property and the offense." 18 U.S.C. § 983(c)(3) (emphasis added). These are minimal pleading requirements that must be satisfied to permit imposition of a response duty upon a claimant.

I.     **The Complaint Fails to Meet Any of the Pleading Standards**

The Complaint fails to identify a jurisdictional basis to adjudicate title to the *in rem* Defendant and fails to connect the Defendant with any criminal offense. Among other requirements, the Government must allege that a "substantial connection" exists between the defendant property and the offense charged. Here, the Complaint fails to allege that the defendant yacht had a substantial connection with the money laundering transactions alleged. Indeed, as explained above, the monies which were sent to the European Financial Institution from January 14, 2015 to February 12, 2015 predated the alleged "bribery" of June 2015. Complaint, ¶ 54 Further, the Complaint fails to trace the only alleged unlawful "proceeds" (European Financial Institution transfers in early 2015) into any relevant domestic bank account, into any corporation, or even into any bank account associated with the defendant yacht.

While the jurisdictional defects are insurmountable, the Complaint also fails to state a claim under either 18 U.S.C. § 981(a)(1)(A) or (C). Specifically, there is no allegation that the defendant yacht was "involved in" any money laundering transaction for liability to attach under § 981(a)(1)(C).

The sum total of the Complaint's allegation that the Defendant is connected to any misconduct, is found in paragraphs 51 & 52, which offer the conclusion that "more than $3 million traceable to the Eaton-Rantor Loan scheme was transferred from European Financial Institution 1 to a yacht sales company in Miami," which was then the approximate amount of the monies that company used to "fund" the purchase of the yacht. Complaint, ¶¶ 51 & 52.

The necessary assumption of this claim—that the Eaton-Ranton Loan was itself a FCPA violation, is false. But even if it could be such an offense, this conclusory allegation, falls into the paradigmatic category of what is *not* money laundering—the spending of alleged proceeds.[4]

---

[4] *See, e.g., United States v. Johnson*, 440 F.3d 1286, 1293 (11th Cir. 2006) ("a money laundering concealment conviction pursuant to § 1956 requires evidence of something more than a simple transfer of funds between two accounts, each bearing the parties' correct name"); *United States v. Caldwell*, 560 F.3d 1214, 1221(10th Cir. 2009) (citing *Cuellar,* money laundering "requires

"Merely engaging in a transaction with money whose nature has been concealed through other means is not in itself a crime .... If transactions are engaged in for present personal benefit, and not to create the appearance of legitimate wealth, they do not violate the money laundering statute." *United States v. Majors*, 196 F.3d 1206, 1212-13 (11th Cir. 1999) (quoting *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1474 (10th Cir. 1994). In particular, "payments for personal benefits out of previously laundered proceeds do not themselves constitute money laundering unless they are designed to conceal the nature or source of the money." *United States v. Magluta*, 418 F.3d 1166, 1176 (11th Cir. 2005). Indeed, the predominate money laundering activity conclusory alleged in the Complaint—concealment—is conspicuous for its absence of any allegation of a "design" to conceal anything with respect to the defendant yacht. *Cuellar v. United States*, 553 U.S. 550, 567 (2008).

Indeed, the Complaint proposes to expand federal forfeiture law beyond any known limitation. The Complaint alleges that monies generated from alleged bribery occurring in Venezuela were laundered by transfer to European Financial Institution 1. Under this Circuit's precedent, this completes the laundering offense. *United States v. Christo*, 129 F.3d 578 (11th Cir. 1997). Plaintiff alleges that thereafter, European Financial Institution 1 transferred monies to a Miami company that in turn funded the acquisition of the defendant yacht. Using a European bank does not render all subsequent financial transactions by that bank fodder for forfeiture.

**II.  The Court Lacks *In Rem* Jurisdiction Over the Defendant**

The lack of *in rem* jurisdiction requires dismissal of a civil forfeiture complaint. *United States v. $389,820,000 in United States Currency,* 829 Fed. Appx. 488, 491 (11th Cir. Oct. 7, 2020) ("'Jurisdiction is power to declare law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'") (quoting *Burr v. Forman,* 470 F.3d 1019, 1035 (11th Cir. 2006) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)). This Court lacks *in rem* jurisdiction to forfeit a yacht in Curacao. Following the doctrine of constitutional avoidance,[5] this Court should construe the cited statutory claim of *in rem* jurisdiction

---

more than just writing a check with the proceeds of unlawful activity:" use of check inconsistent with allegation of concealment or defendant's intent to conceal).

[5] *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018); *Clark v. Martinez,* 543 U.S. 371, 381 (2005) ("It is a tool for choosing between competing plausible interpretations of a statutory text,

as insufficient to afford it jurisdiction over a yacht in Curacao that has not been placed under the control of this Court by seizure or constructive control. Moreover, even if Congress intended to authorize federal courts to assert *in rem* jurisdiction over all assets abroad (it didn't), such an expansion of *in rem* jurisdiction would be unconstitutional as exceeding Article III jurisdiction and a violation of Due Process (Fifth Amendment).

As the party claiming the jurisdiction of this Court, the government bears the burden of proving jurisdiction. *CFTC v. G7 Advisory Serv., LLC*, 406 F.Supp.2d 1289, 1291 (S.D. Fla. 2005). The heightened pleading standards of Supplemental Rule G(2)(b) expressly require a valid forfeiture complaint to "*state the grounds for subject-matter jurisdiction, in rem jurisdiction over the defendant property.*" (emphasis added). This Complaint fails this standard by failing to allege how Plaintiff secured this Court's jurisdiction over a foreign-owned yacht currently in Curacao.

The civil forfeiture laws are leveled at things ("*res*") which are the only proper *in rem* defendants. Indeed, the *raison d'etre* of civil forfeiture proceedings—and their substantial departures from the constitutional protections afforded to individuals in criminal forfeiture proceedings—is to avoid individual rights by indulging in the "legal fiction"[6] of a Government claim against an "inanimate" *res* that lacks the personal rights of individuals and companies:

> The classical distinction between civil and criminal forfeiture was founded upon whether the penalty assessed was against the person or against the thing. Forfeiture against the person operated *in personam* and required a conviction before the property could be wrested from the defendant. Such forfeitures were regarded as criminal in nature because they were penal; they primarily sought to punish. Forfeiture against the thing was *in rem* and the forfeiture was based upon the unlawful use of the *res,* irrespective of its owner's culpability. These forfeitures were regarded as civil; their purpose was remedial.

*United States v. Gilbert*, 244 F.3d 888, 919 (11th Cir. 2001) (quoting *United States v. Seifuddin,* 820 F.2d 1074, 1076-77 (9th Cir. 1987) (Supreme Court citations omitted)).

---

resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts.").

[6] *United States v. Ursery*, 518 U.S. 267, 275 (1996) ("'It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient.'") (quoting *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931)).

The government would have this Court assert *in rem* jurisdiction over a yacht in Curacao, and presumably all other property across the globe. That is fundamentally at odds with *in rem* jurisdiction principles, including those that prohibit the simultaneous exercise of *in rem* authority over the same *res* by two separate sovereigns[7]--an issue here because of the recent Curacao judgment-- and the jurisdictional precondition of the court securing control over the defendant *res*. *See $38 million*, 816 F.2d at 1545 (complaint not a warrant and does not excuse government failure to execute process).

According to a letter sent to Claimant MTGP135 LTD, a court in Curacao has apparently asserted jurisdiction of this same defendant yacht and ordered that it be sold, crystallizing the jurisdictional impediment to the instant proceeding:

> Dear Sir, Madam,
>
> On behalf of our client, SANTA BARBARA RECREATION N.V., doing business as Seru Boca Marina, with its registered office in Curacao, at Porta Blanku Nieuwpoort, I herewith inform you that at the request of our client, the Court in First Instance of Curacao has, in its judgment dated 25 January 2021, set the day, time and place for the judicial sale of the vessel BLUE ICE (MMSI number 375154000) at **Friday, 5 March 2021 at 09:30 hrs**, at the courthouse in Willemstad, Curacao, located at Emancipatie Boulevard Dominico "Don" Martina 18.
>
> Should you have any questions in this respect, please do not hesitate to contact us.

Letter from attorney Eva M. Pennings, Solid Attorneys, dated January 26, 2021, addressed to Claimant MTGP135 LTD (a copy is attached as Exhibit 1 to this motion).[8] Under long established precedent, a federal court lacks jurisdiction when another sovereign asserts jurisdiction over the

---

[7] *See, e.g.*, *Farmers' Loan and Trust Co. v. Lake St. Elev. R Co.*, 177 U.S. 51, 61 (1900). ("The possession of the *res* vests the court which has first acquired jurisdiction with the power to hear and determine all controversies relating thereto, and for the time being disables other courts of co-ordinate jurisdiction from exercising a like power. This rule is essential to the orderly administration of justice, and to prevent unseemly conflicts between courts whose jurisdiction embraces the same subjects and persons."). *Accord United States v. $270,0000 in U.S. Currency*, 1 F.3d 1146, 1148 (11th Cir. 1993) (*citing Penn General Casualty Co. v. Commonwealth*, 294 U.S. 189, 195 (1935)).

[8] Undersigned has contacted attorney Pennings to request copies of said judgment but attorney Pennings has not yet responded.

*res*. *United States v. $270,000*, 1 F.3d at 1147 (citing *Penn General Casualty*, 294 U.S. at 195 (1935)).

### A. There Has Been No Seizure or Control Necessary to Establish *In Rem* Jurisdiction

Subsection 981(b)(1) of Title 18 authorizes the initiation of civil forfeiture proceedings by means of a seizure of the defendant *res*, using warrant procedures described in subsection 981(b)(2). No such procedures have been invoked by the Government here.

Courts require the Government to seize, or to take actual or constructive control of, the *in rem* defendant in order to establish the court's *in rem* jurisdiction over it. *United States v. James Daniel Good Real Property*, 510 U.S. 43, 55 (1993). This practice goes back centuries and in substantial part was derived from the enforcement practices of the British Navigation Acts of 1660 and 1696 and the necessity of acquiring jurisdiction over ships by taking physical custody of them and their cargoes. *C.J. Hendry Co. v. Moore*, 318 U.S. 133, 137-41 (1943). Historically, such forfeiture proceedings were commenced with the seizure of the property, thereby conferring *in rem* jurisdiction upon the seizing court with custody and control over the property—here, theoretically the Southern District of Florida. *Republic Na'l Bank*, 506 U.S. at 85 (seizure necessary to institute civil forfeiture case). *See generally Pennoyer v. Neff*, 95 U.S. 714 (1877) (seizure of property by proper process necessary for valid *in rem* judgment). Defendant yacht has not been seized by the government, and is in the territory and jurisdiction of a foreign nation, whose court appears to be exercising jurisdiction over it.

The government has cited 28 U.S.C. § 1355(a) and § 1345 as a basis for this Court's *in rem* jurisdiction. Complaint, ¶ 3. Section 1345 simply recognizes this Court's subject matter jurisdiction over suits brought by the United States. Section 1355(a) does not confer *in rem* jurisdiction over property abroad that has not been reduced to the custody or control of the Court. *United States v. All Funds on Deposit in any Accounts Maintained in Names of Meza or De Castro,* 63 F.3d 148, 152 (2d Cir. 1995). Indeed, section 1355(d) contemplates that a court addressing property outside of its district, acting under subsection 1335(b), will "issue and cause to be served in any other district court such process as may be required to bring before the court the property that is the subject of the forfeiture action."

Although several circuits (but not the Eleventh) have construed § 1355 as conferring *in rem* jurisdiction over property abroad that has not been reduced to the custody or control of the

court, they are either distinguishable,[9] or wrong.[10] As the Supreme Court noted in *James Daniel* and *Republic National Bank*, the requirement of custody and control has historically been a central component of forfeiture law. The Supreme Court, as long ago as the *Pennoyer* case in 1877, noted that custody of the defendant property is what enables a court to adjudicate title to it as against the world. *See also United States v. Obaid*, 971 F.3d 1095, 1101 (9th Cir. 2020) (noting "longstanding precedent anchoring *in rem* jurisdiction to the presence of the *res*.").

### B. The Purported Exercise of Global *In Rem* Jurisdiction Is Unconstitutional

The jurisdiction of federal courts is limited by Article III and by the Due Process Clause. As plaintiff, the government bears the burden of proving jurisdiction.[11] A federal court lacks Article III authority to exercise *in rem* jurisdiction over a *res* abroad that has not been placed within its custody or control. Article III jurisdiction is limited to disputes that are redressable and for which a court can enter a binding judgment; without these, a court only has authority to issue advisory opinions. Here, this Court is relegated to offering an advisory opinion on a yacht subject to the jurisdiction of a Curacao court.

In *United States v. Batato*, 833 F.3d 413 (4th Cir. 2016), the government brought civil forfeiture proceedings against foreign property and the issue was whether the trial court had *in rem* jurisdiction based upon the fact that the property had been secured by foreign courts at the request of our government. The majority opinion held that *in rem* jurisdiction existed, but did so on the basis that the foreign court seizures gave the court confidence that any ultimate forfeiture judgment would be honored by the foreign courts.[12] The dissent disagreed and would have held that the

---

[9] In *United States v. Batato*, 833 F.3d 413 (4th Cir. 2016), the Fourth Circuit addressed a civil forfeiture action in which the foreign property had been restrained by court order and the court found that the foreign court would honor any ultimate forfeiture judgment. Neither applies here.

[10] See *United States v. Oil Tanker Bearing International Maritime Organization Number 9116512*, 2020 WL 4569424, *3 (D.D.C. August 7, 2020) (asserting *in rem* jurisdiction over Iranian oil tankers in the Mediterranean) (citing *United States v. Approximately $1.67 million in Cash*, 513 F.3d 991, 998 (9th Cir. 2008)).

[11] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *United States v. $557,933.89, More or Less, In U.S. Funds*, 287 F.3d 66, 79 n.9 (2d Cir. 2002).

[12] *Batato*, 833 F.3d at 422 ("the foreign sovereigns have cooperatively detained the res by issuing orders restraining the defendant property pursuant to this litigation. By showing that the *res* was placed in custody in New Zealand and Hong Kong based on the district court's order, JA 468-69,

exercise of *in rem* jurisdiction over foreign court-seized property violated Article III because a judgment would not be legally effective or binding upon the foreign courts. *Batato*, 833 F.3d at 438.

The Due Process Clause limits the exercise of *in rem* jurisdiction by a court beyond its territory:

> The other principle of public law referred to follows from the one mentioned; that is, that no State can exercise direct jurisdiction and authority over persons or property without its territory. Story, Confl. Laws, c. 2; Wheat. Int. Law, pt. 2, c . . . .
> And so it is laid down by jurists, as an elementary principle, that the laws of one State have no operation outside of its territory, except so far as is allowed by comity; and that no tribunal established by it can extend its process beyond that territory so as to subject either persons or property to its decisions. 'Any exertion of authority of this sort beyond this limit,' says Story, 'is a mere nullity, and incapable of binding such persons or property in any other tribunals.' Story, Confl. Laws, sect. 539.

*Pennoyer*, 95 U.S. at 722-23. This territorial limitation on *in rem* jurisdiction has not been questioned since by the Supreme Court. In 2020, the Ninth Circuit held that the Supreme Court had not overruled its *Pennoyer* precedent of 1877, distinguishing between *in rem* and *in personam* jurisdiction, noting "it would be 'exceeding strange' if the Supreme Court intended to eliminate the historical distinction between *in personam* and *in rem* jurisdiction without explicitly saying so." *Obaid*, 971 F.3d at 1101-02 (quoting Shakespeare, Merchant of Venice, Act I, Scene 1).

The Due Process limitation on the extraterritorial exercise has since been modified in the context of *in personam* jurisdiction and *quasi-in-rem* proceedings with a focus upon the individual defendant's minimum contracts with the forum. *See, e.g., Shaffer v. Heitner*, 433 U.S. 186 (1977) (quasi-in-rem jurisdiction); *Int'l Shoe, Co. v. Washington*, 326 U.S. 310 (1945). But, as the *Obaid* opinion recently noted, the Supreme Court has not vacated *Pennoyer*'s sovereignty-based holding with respect to *in rem* jurisdiction, even if it did in *Shaffer* allocate *quasi-in rem* jurisdiction to a minimum contact test.

The Complaint satisfies neither jurisdictional requirement—(i) there are no pled minimum contacts between the defendant yacht and the United States; and (ii) it is pled as being located

---

the government has demonstrated that it is likely, rather than speculative, that these courts will honor a forfeiture order from the United States").

abroad. Complaint, ¶ 1(i). This falls well below the Government's pleading burden to: *"state the grounds for subject-matter jurisdiction,* in rem *jurisdiction over the defendant property."* Supp. Rule G(2)(b) (emphasis added).

## III. The Complaint Fails to Allege a FCPA Violation, Justifying Its Dismissal

The lynchpin of the Complaint's forfeiture claims is the FCPA allegation surrounding the June 2015 payment by CS to Venezuelan Official 1 in connection with the Eaton-Rantor-PDVSA loan "scheme." Complaint, ¶¶ 44-48. But the FCPA has legal requirements and limitations that render these vague and conclusory allegations implausible and insufficient as a matter of law.[13]

Initially, the Complaint fails to allege the loan contract was itself improper or derived from a bribe payment. The Complaint is equally consistent with the negotiation and execution of a valid government loan as to which both sides obtained the benefit of their bargains. To that end, a Venezuelan court has apparently completed an investigation of this loan and its repayment and concluded that it was legally issued and performed. *See* Opinion of the Lower Court (11th) in

---

[13] In relevant part, 15 U.S.C. § 78dd-3 states:

**a) Prohibition**
It shall be unlawful for any person other than an issuer that is subject to section 78dd-1 of this title or a domestic concern (as defined in section 78dd-2 of this title), or for any officer, director, employee, or agent of such person or any stockholder thereof acting on behalf of such person, while in the territory of the United States, corruptly to make use of the mails or any means or instrumentality of interstate commerce or to do any other act in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—
* * *
(3) any person, while knowing that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, to any foreign official, to any foreign political party or official thereof, or to any candidate for foreign political office, for purposes of--

(A)(i) influencing any act or decision of such foreign official, political party, party official, or candidate in his or its official capacity, (ii) inducing such foreign official, political party, party official, or candidate to do or omit to do any act in violation of the lawful duty of such foreign official, political party, party official, or candidate, or (iii) securing any improper advantage; or

(B) inducing such foreign official, political party, party official, or candidate to use his or its influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality,

in order to assist such person in obtaining or retaining business for or with, or directing business to, any person.

Control of Functions, Criminal Judicial Circuit of the Caracas Metropolitan Area, September 16, 2020 (a copy is attached as **Exhibit 2**; the English translation is attached as **Exhibit 3** to this motion).[14] Among its many findings, this judgment points out that the Venezuelan government is the financial beneficiary of these types of fixed currency exchanges. Pleading allegations that are equally consistent with no liability justify dismissal of a complaint. *Twombly*, 550 U.S. at 544; *Credit Bureau Services, Inc. v Experian Information Solutions, Inc.*, 2012 WL 6102068, *20 (S.D. Fla. Dec. 7, 2012)).

Second, the loan -- between a Venezuelan company (Rantor) and its government -- is not covered by the FCPA. As the Second Circuit has explained, "the FCPA clearly dictates that foreign nationals may only violate the statute outside the United States if they are agents, employees, officers, directors, or shareholders of an American issuer or domestic concern." *United States v. Hoskins*, 902 F.3d 69, 97 (2d Cir. 2018). In *Hoskins*, the Second Circuit examined the language and history of the FCPA, which Congress carefully targeted at corrupt acts of bribery undertaken by registered U.S. stock companies to procure foreign business for their benefit and that of their stockholders. *Hoskins* held that liability under the FCPA extends only an "agent of a domestic concern." 902 F.3d at 72. The FCPA excludes "nonresident foreign nationals outside American territory without an agency relationship with a U.S. person, and who are not officers, directors, employees, or stockholders of American companies." 902 F.3d at 84.

The Complaint does not allege that any of the participants in the Eaton-Rantor loan scheme were U.S. domestic issuers or their employees or agents. No domestic U.S. issuer is identified in the Complaint as having any involvement with the issuance and repayment of the loan. Hence, the Venezuelan government's repayment of the loan could not, as a matter of law, generate proceeds of a FCPA violation forfeiture by this Court. Moreover, there is no allegation that the alleged bribe by CS of Venezuelan official 1 in June 2015 (*id.*, ¶ 45) itself involved any U.S. domestic concern, or for that matter, generated any monies distributed to a US domestic issuer or their stockholders. Nor are these FCPA coverage limitations circumvented by the Complaints' claims of secondary liability (conspiracy and aiding and abetting), as the Complaint attempts to do. Complaint, ¶¶

---

[14] Undersigned was provided a copy of the opinion (which is in Spanish), along with an English translation, which undersigned provided to government counsel for inspection. Undersigned is endeavoring to obtain and file certified copies of same, given that government counsel has advised that the government will object to Claimant's reliance on uncertified copies.

47,122 (bribe payments "violated not only Venezuelan bribery laws, but also the FCPA because one or more members of the conspiracy engaged in corrupt acts from within the territory of the United States"). Initially, such conclusory conspiracy clause would never satisfy the plausibility standard of *Twombly* (rejecting conclusory conspiracy allegations). And there is no secondary liability under the FCPA for persons or entities not expressly covered by it. Likening the FCPA to the Mann Act, which the Supreme Court addressed in *Gebardi v. United States*, 287 U.S. 112, 121 (1932), the Second Circuit in *Hoskins* explained:

> In particular, the carefully tailored text of the statute, read against the backdrop of a well-established principle that U.S. law does not apply extraterritorially without express congressional authorization and a legislative history reflecting that Congress drew lines in the FCPA out of specific concern about the scope of extraterritorial application of the statute, persuades us that Congress did not intend for persons outside of the statute's carefully delimited categories to be subject to conspiracy or complicity liability.

*Hoskins*, 902 F.3d at 83-84.

The concerns about extending the extraterritorial reach of the FCPA beyond U.S. stock issuers and their agents are especially compelling here because:

- The payor of the alleged proceeds has ratified the legal of the transaction from beginning to end;
- The borrower-payor is the Venezuelan government which is a state actor that has sovereign interests at stake in its access to the foreign currency markets, especially through its citizens; and,
- There is no domestic US stock issuer identified as taking advantage of the Venezuelan government's contracts or their exchange terms.

The actions of the Venezuelan government in seeking a loan, setting the terms for its repayment, and repaying it are the actions of a sovereign. The foreign exchange terms of such a loan are the sovereign business of Venezuela, especially given the admitted fact that its oil company constitutes the "primary source of income and foreign currency (namely, U.S. dollars and Euros)." Complaint, ¶ 9. The act of state doctrine bars suit when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp. Int'l*, 493 U.S. 400, 405 (1990). The official acts underlying the terms and performance of the loan are central to the claims and defenses here and took place within Venezuela. The Act of

State doctrine is a judicial limitation on the right to sue. *United States v. Noriega*, 746 F.Supp. 1506, 1521 (S.D. Fla. 1990) (Hoeveler, J.), *aff'd on other grounds*, 117 F.3d 1206 (11th Cir. 1997). Both in the first instance (issuance and performance of the loan) and subsequently (the recent ratification of the loan by the Venezuelan government), the Venezuelan government has vouched for the validity of its terms. Plaintiff is thus asking this Court to overrule the judgment of a sovereign government, based upon the allegations of the Complaint.

## IV.     The Complaint Fails to Allege a Plausible Tracing Claim

The specific forfeiture authority invoked by the Complaint for Claim 1 is 18 U.S.C. § 981(a)(1)(C), which subjects to forfeiture "any property, real or personal, *which constitutes or is derived from proceeds traceable* to a violation of" these specific unlawful offenses. (emphasis added). Claims 2 through 6 allege forfeiture under 18 U.S.C. § 981(a)(1)(A), which makes forfeitable any property "involved in a transaction or attempted transaction in violation of" the money laundering laws "or any property traceable to such property." For both types of forfeiture—"involved in" or traceable proceeds—a substantial connection, or nexus, must exist between the defendant property and the alleged criminal offense, and this is a necessary proof burden of the government by a preponderance of the evidence. 18 U.S.C. §§ 983(c)(1) & (3). This tracing burden has been characterized as proof that, more likely than not, the property at issue constitutes traceable proceeds. *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1211 (11th Cir. 2013).

The government bears the burden of proving that the yacht is traceable to the charged offense. *United States v. Ayika*, 837 F.3d 460, 471 (5th Cir. 2016). The burden is "demanding" and requires the government to establish that it is more likely than not that current, identifiable monies are derived from the criminal offense, which requires first a determination whether *any* of the remaining monies are themselves traceable to the prior offense. *Id.*, at 472, 474.

Aside from the conclusory allegation that the European Financial Institution 1 monies used to purchase the yacht were "traceable to the Eaton-Rantor Loan Scheme," there is no factual allegation tracing any monies from Venezuela to Europe to the defendant yacht. If anything, the timing of the alleged transfers to the European Financial Institution (January and February 2015) contradicts any characterization of these monies as either proceeds of, or property involved in, the subsequent June 2015 so-called "bribe." The Fifth Circuit in *Ayika* rejected a government tracing claim that monies remaining in the bank account of a healthcare defendant were traceable based solely upon a government showing that 33% of deposited monies were derived periodically from

healthcare violations. 837 F.3d at 474 (holding legally insufficient "evidence only that 33.55% of the funds deposited into the Chase account, at various times over the life of the account, represented gross proceeds of the crime of conviction"). This Court should do the same.

## V. The Complaint Fails to State a Non-Conclusory Claim

The Complaint purports to allege six separate "claims for relief" under two separate forfeiture statutes. Complaint, ¶¶ 159-80. The First Claim (*id.*, ¶¶ 159-61) consists of a conclusory allegation of forfeiture under 18 U.S.C. § 981(a)(1)(C). The First Claim, like the rest, consists of nothing more than a conclusory listing of statutory elements in a single paragraph. *Id.*, ¶ 122. Such a conclusory allegation must be disregarded as a "formulaic" recitation insufficient as a matter of law under Rules 8 and 12(b)(6). *Iqbal,* 556 U.S. at 679. Conclusory pleadings reciting statutory elements are legally insufficient in civil forfeiture cases too. *United States v. $55,518*, 728 F.2d 192, 196 (3rd Cir. 1984).

The remaining six "claims for relief" are equally conclusory and are different only in that they recite the elements of a different forfeiture statute, 18 U.S.C. § 981(a)(1)(A), which is also done rotely in single paragraphs. Complaint, ¶¶ 125 (Claim 2), 128 (Claim 3), 131 (Claim 4), 134 (Claim 5), and 137 (Claim 6). These conclusory allegations contain not one factual assertion connecting the defendant asset to any offense. The only "facts" contained in any of these claims are those incorporated by reference from the first 158 paragraphs of the Complaint. No effort is taken to connect any incorporated fact with any recited element, leaving this Court and Claimant to guess the factual and legal basis for the government's claims. This does not satisfy Supplemental Rule G(2).

## VI. The Forfeiture Claim Is Time-Barred Under 18 U.S.C. § 984(c)

Under 18 U.S.C. § 984(c): "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." This limitation is mandatory and applies to "any forfeiture action *in rem* in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . ., or other fungible property." *Id.*, § 984(b)(1). *Marine Midland Bank v. United States*, 1994 WL 381536, *3 (S.D.N.Y. July 20, 1994) (forfeiture claim based upon monies in account time-barred under mandatory one-year limitations statute).

Here, the Complaint alleges that $300,000 bribery took place in Venezuela in June 2015 (Complaint, ¶ 45) with the laundering taking place in 2015 and the proceeds of that bribery being transferred to the European Financial Institution in January and February of 2015. *Id.*, ¶¶ 54.

The origin and purpose of section 984(c)'s one-year limitations prior demonstrate why Congress intended it to apply to just such a case as this. Section 984(c) was enacted by Congress in response to the tracing issues created by forfeiture claims directed at fungible property, like money, that can be deposited into a bank account, but then be withdrawn to reduce the balance. In particular, courts had imposed tracing limitations from trust law shielding licit monies in accounts once their balance declined below the amount of the original illicit deposit—requiring the government to trace the offense to the monies currently in the account. *See, e.g., Marine Midland Bank v. U.S.*, 11 F.3d 1119, 1126 (2d Cir. 1993) (section 984(c) enacted in response to the "intermediate balance" defense); *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1160 (2d Cir. 1986). Section 984(c) was intended to lessen the government's tracing burden with respect to fungible property (like money) by permitting the forfeiture of equivalent amounts of fungible property from the same account in a financial institution. 11 F.3d at 1126. But critically, Congress offset this tracing leniency by restricting the availability of such forfeitures to one-year limitations period. *Id.*; 18 U.S.C. § 984(a)(B) (not a "defense that the property involved in such an offense has been removed and replaced by identical property").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Respectfully submitted through counsel,

**BLACK, SREBNICK, KORNSPAN & STUMPF, P.A.**
201 South Biscayne Boulevard, Suite 1300
Miami, FL 33131 / Tel: (305) 371-6421

/s/ Howard Srebnick
**HOWARD SREBNICK**
  Fla. Bar No. 919063
  Email: HSrebnick@RoyBlack.com