**REPÚBLICA BOLIVARIANA DE VENEZUELA**



**EN SU NOMBRE**
**JUZGADO UNDECIMO (11°) DE PRIMERA INSTANCIA**
**EN FUNCIONES DE CONTROL CIRCUITO JUDICIAL PENAL ÁREA**
**METROPOLITANA DE CARACAS**

**Caracas, 16 de septiembre de 2020**
**209° y 160°**

**EXPEDIENTE N°: 17.670-20**

Corresponde a éste Juzgado Undécimo (11°) de Primera Instancia en Funciones de Control del Circuito Judicial Penal del Área Metropolitana de Caracas, emitir pronunciamiento en virtud del escrito recibido el 28 de agosto de 2020, suscrito por el profesional del derecho **FARIK KARIN MORA SALCEDO** en su carácter de Fiscal Provisorio (67°) a Nivel Nacional con Competencia Plena del Ministerio Público, mediante el cual solicita a este Juzgado el decreto del sobreseimiento en la presente causa signada por ese despacho fiscal con el Nro. MP-193947-2017, seguida en contra de los ciudadanos **RAUL ANTONIO GORRIN**, titular de la cédula de identidad Nro. V-8.682.996, **GUSTAVO PERDOMO**, titular de la cédula de identidad Nro. V-14.585.388, y **VICTOR EDUARDO AULAR BLANCO**, titular de la cédula de identidad Nro. V-6.835.572, de conformidad con lo dispuesto en el artículo 300 numeral 1 del Código Orgánico Procesal Penal.

**I**
**DEL ESCRITO DE SOLICITUD FISCAL**

Cursa a los folios dos (02) al cincuenta y tres (53) de la segunda pieza, escrito suscrito por el profesional del derecho **FARIK KARIN MORA SALCEDO** en su carácter de Fiscal Provisorio (67°) a Nivel Nacional con

1

Competencia Plena del Ministerio Público, mediante el cual efectúa las siguientes consideraciones:

"...**DE LOS HECHOS**

En fecha 28 de abril de 2017, se dio inicio a la presente investigación en virtud de denuncia presentada por el ciudadano **LUIS ALEJANDRO TELLERIA PERDOMO**, titular de la cédula de identidad No. V-5.836.084, en contra de los ciudadanos **JULIO BORGES, JOSE GREGORIO CORREA, RAÚL ANTONIO GORRÍN**, y **GUSTAVO PERDOMO**, entre otros, titulares de las cédulas de identidad Nros. V-3.222.831, V-6.290.670, V-8.682.996 y V-5.766.428, respectivamente, por la presunta comisión de delitos de Legitimación de Capitales, Traición a la Patria, Corrupción, Instigación Pública y Asociación. Señala el denunciante en su escrito consignado en el Despacho de la Fiscal General de la República, entre otras cosas, lo siguiente:

Omissis...

Respecto a los hechos señalados por el ciudadano LUIS ALEJANDRO TELLERIA PERDOMO, debe advertirse que esta representación fiscal se RESERVA EL DERECHO DE CONTINUAR LA INVESTIGACIÓN Y REALIZAR UN PRONUNCIAMIENTO POR SEPARADO, en virtud que a la fecha aún se encuentran pendientes de ser recabadas las resultas de una serie de diligencias de investigación que fueron ordenadas y se estiman imprescindibles para resolver acerca de la existencia o no de los hechos planteados en la denuncia. Entre otras diligencias, fue librada Solicitud de Asistencia Mutua en Materia Penal a República Dominicana, a los fines de recabar datos acerca de la referida reunión; igualmente, se solicitaron entre otras cosas que informen si el ciudadano Raúl Gorrín y Gustavo Perdomo poseen bienes muebles e inmuebles y si tienen participación accionaria de alguna empresa, y si los mismos figuran como miembros de la directiva de un banco en el referido país.

Con posterioridad a la referida denuncia que dio origen a esta causa, en fecha 14 de agosto de 2017, fue agregada a las presentes actuaciones otra denuncia presentada ante la Dirección General de Actuación Procesal del Ministerio Público, por el ciudadano **OSCAR ADOLFO RONDEROS RANGEL**, titular de la cédula de identidad No. V-10.376.183, en su condición de Diputado Suplente a la Asamblea Nacional por el estado Nueva Esparta, en la cual manifestó lo siguiente:

2

"...Ahora bien, ante este esquema de desvío de divisas ya ha sido profundamente investigado por el Ministerio Público y en algunos casos ya se han establecido responsabilidades y sanciones tanto personales como patrimoniales a sus autores y responsables, pero he notado como venezolano preocupado que existe un punto ciego donde no se ha investigado y es la asignación de divisas directamente por **PETROLEOS DE VENEZUELA (PDVSA)** a particulares sin cumplir con el régimen cambiario existente y sobre este punto en específico para no entrar en especulaciones quiero referirme en concreto en (sic)  una operación por **SIETE MIL DOSCIENTOS MILLONES DE BOLÍVARES (BsF 7.200.000.000,00)** pagaderos en dólares, realizada presuntamente por **PDVSA** en contra del patrimonio de todos los venezolanos.

Esta operación que data de diciembre de 2014, recientemente fue reseñada mediáticamente en el mes de abril de 2017, en diversos medios de comunicación escritos, electrónicos, radiales y televisivos, tanto nacionales como internacionales, se le dio una amplia difusión en relación a esta aparente operación de créditos entre **PETROLEOS DE VENEZUELA (PDVSA)** y entidades privadas no financieras (particulares), en específico en varias (sic) reportajes de prensa emanadas de la organización no gubernamental, entre ellos cito la publicación de **CUENTAS CLARAS**, link _https://www.cuentasclarasdigital.org/_, titulado varios-extesoreros y operadores financieros del chavismo negocian con fiscales federales de EE.UU, de cuyo contenido se extrae lo siguiente:

"...**El Cadivi paralelo de Pdvsa.** Durante la administración de **Rafael Ramírez** funcionó en la petrolera estatal un mecanismo de administración de divisas paralelo al oficial que estableció tasas de cambio ilegales y arbitrarias para convertir directamente los dólares de la venta de petróleo en bolívares. El supuesto objetivo era cubrir los gastos de la empresa en el territorio nacional.

A través de esta especie de Cadivi paralelo, violando varias leyes y reglamentos, Rafael Ramírez y los integrantes de la directiva, en especial el responsable de las finanzas, **Víctor Aular Blanco**, en complicidad con un grupo de jóvenes empresarios denominados **los bolichicos** y la asesoría de **Oberto**, ejecutaron oscuros contratos confidenciales con compañías escogidas a dedo, sin pasar por subastas públicas, que generaron grotescas fortunas para sus operadores, en base al diferencial cambiario existente entre la tasa oficial del momento, la del denominado mercado negro y la establecida ilegalmente por la directiva de Pdvsa...

3

*...omissis...*

*Fuentes de CuentasClarasDigital sostienen que entre las mayores operaciones ejecutadas por Raúl Gorrín en Pdvsa, figura la relacionada con un crédito por 7.200 millones de bolívares, pagadero en dólares, otorgado a la petrolera por la compañía **Rantor Capital, CA.**, el 17 de diciembre de 2014, fecha de la conmemoración de la muerte del Libertador Simón Bolívar. Dos semanas después, Rantor cedió el contrato por un monto de 1.143 millones de dólares a la compañía **Eaton Global Services Limited,** constituida en Hong Kong.*

*Con esta operación y otras similares, Malpica Flores copió los mecanismos ilegales de sus antecesores y continuó con los negociados en torno al diferencial cambiario, al mismo estilo de los ejecutados anteriormente por la Pdvsa de Rafael Ramírez con la Administradora Atlantic 17107 CA."*

*De dicho reportaje surge la necesidad imperiosa de investigar los pormenores sobre la existencia real de esta operación por **SIETE MIL DOSCIENTOS MILLONES DE BOLÍVARES (BsF 7.200.000.000,00)** pagaderos en dólares, la vinculación o no de las empresas **RAPTOR CAPITAL C.A.** y **EATON GLOBAL SERVICES LIMITES** con dicha operación, si esta negociación implicaba una operación de cambio de divisas fuera del régimen cambiario vigente, si la misma estaba ajustada al ordenamiento legal venezolano y si finalmente surgió una malversación o perjuicio en contra del patrimonio del estado administrado por **PDVSA**, ya que en mi entender como representante legítimo del pueblo de verificarse las hipótesis fácticas que señala el artículo parcialmente transcripto, presuntamente estaríamos en presencia de delitos contra el Régimen Cambiario, la Ley Contra la Corrupción (Malversación y Peculado) y la Ley Contra la Delincuencia Organizada en lo atinente a los ilícitos de Asociación para Delinquir y Legitimación de Capitales.*

*Asimismo, ante estos eventos es claro considerar que una vez obtenida la ganancia por la referida operación, los actores mencionados en la referida nota, presuntamente han ocultado tales dividendos adquiriendo activos, para legitimar dicha actividad ilícita..."*

Ahora bien, de acuerdo a los hechos denunciados, y conforme al resultado de las diligencias de investigación practicadas, puede afirmarse que en fecha **17 de diciembre de 2014** fue suscrito un contrato de préstamo a interés bajo el mecanismo de línea de crédito, entre **Petróleos de Venezuela S.A. (PDVSA)** y la empresa venezolana **RANTOR CAPITAL, C.A.**, por un monto de siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.).

4

*El referido monto en bolívares le fue entregado a PDVSA en diversas fechas desde el 19 de diciembre de 2014, siendo la última el 12 de enero de 2015, habiéndose cumplido con la cancelación total del referido préstamo a PDVSA.*

*Con posterioridad a la suscripción del referido contrato de préstamo,* **RANTOR CAPITAL, C.A.,** *cedió sus derechos como acreedor de* **PDVSA***, por medio de un contrato de cesión de fecha del 30 de diciembre de 2014, a otra empresa llamada* **EATON GLOBAL SERVICES LIMITED***, estableciéndose expresamente en el referido contrato de cesión de derechos unos porcentajes de descuento de la deuda de PDVSA con* **EATON GLOBAL SERVICES LIMITED** *si se procedía a la cancelación anticipada del préstamo o pronto pago.*

*Una vez suscrito el contrato de cesión, ésta le fue notificada formalmente a la Vicepresidencia de Finanzas de PDVSA, indicándole además que por cuanto* **EATON GLOBAL SERVICES LIMITED** *era una empresa constituida en Hong Kong y no poseía cuenta en moneda de curso legal en Venezuela, los pagos del préstamo otorgado a* **PDVSA** *podrían ser recibidos en dólares o en cualquier otra moneda convertible.*

*Así las cosas, PDVSA realizó pagos a* **EATON GLOBAL SERVICES LIMITED** *en las cuentas indicadas por la referida empresa, en distintas fechas, desde el 29 de diciembre de 2014, hasta el 02 de febrero de 2015, por un monto de Quinientos Once Millones Novecientos Trece Mil Doscientos Setenta Euros con Setenta y Cuatro Céntimos de Euros (EUR. 511.913.270,74), equivalentes a seiscientos millones de dólares americanos (600.000.000,00 US $), correspondientes a los siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.) del préstamo otorgado, calculados a la tasa de cambio oficial para la fecha del pago –diciembre 2014 y enero-febrero de 2015-, la cual era de seis bolívares con treinta céntimos por dólar (6,30 Bs. por 1 $).*

*En fecha 06 de octubre de 2017, luego de la denuncia presentada por el ciudadano* **OSCAR ADOLFO RONDEROS RANGEL***, titular de la cédula de identidad No. V-10.376.183, en su condición de Diputado Suplente a la Asamblea Nacional por el estado Nueva Esparta, éste compareció previa citación, ante la Fiscalía 22° del Ministerio Público a nivel Nacional, a los fines de rendir entrevista; oportunidad ésta en la cual* **RATIFICÓ** *y* **AMPLIÓ** *la denuncia presentada, aportando la siguiente información:*

*"En primer lugar quiero ratificar el contenido mi denuncia y solicito al Ministerio Público, que llegue a la verdad de los hechos, tomando en cuenta todas las situaciones irregulares que se han presentado en PDVSA, no es posible que la propia empresa del Estado fuera un mecanismo de administración de divisas paralelo al oficial, cambiando dólares de la venta de petróleo en bolívares. Para ello efectuaron varias operaciones, pero quiero señalar*

5



*especificamente la relacionada con un crédito por* **SIETE MIL DOSCIENTOS MILLONES DE BOLIVARES (Bs. 7.200.000.000**), *pagadero en dólares, otorgado presuntamente a la estatal petrolera por la compañía Rantor Capital, CA., con esta operación y otras similares, causaron un gran daño al patrimonio del Estado. Estas operaciones fueron posiblemente simuladas para obtener capital y comprar bonos o títulos valores y manejar el control absoluto del mercado paralelo en Venezuela. Es todo.* **SEGUIDAMENTE EL MINISTERIO PUBLICO** *pasa a interrogar al entrevistado, de la siguiente manera:* **PRIMERA PREGUNTA: ¿DIGA USTED, SI EXISTEN OTRAS PERSONAS DISTINTAS VINCULADAS A ESTOS HECHOS A LAS MENCIONADEAS EN SU ESCRITO DE DENUNCIA?. CONTESTO:** *Si el señor* **RAUL GORRÍN**, *no trabajaba solo, siempre labora con el señor* **GUSTAVO PERDOMO**, *actual presidente del canal de televisión Globovisión. Otra de las personas vinculadas a estos hechos era el Consultor Jurídico de PDVSA* **CARMELO URDANETA**, *quien era la persona clave para la elaboración del irregular contrato. Además un director de la empresa del Estado de nombre* **VICTOR AULAR**, *designado por el señor Carmelo para firmar por PDVSA el referido contrato.* **SEGUNDA PREGUNTA**: *¿***DIGA USTED, TIENE CONOCIMIENTO SI HUBO ALGÚN DAÑO PATRIMONIAL A PDVSA? CONTESTO:** *Supongo yo que si la empresa recibió esa cantidad de dinero en bolívares, cuál sería la tasa que consideró para pagar dicho crédito en divisas, es allí donde creo que se causo (sic) un daño al patrimonio de la empresa y por ende al Estado Venezolano.* **TERCERA PREGUNTA**: *¿***DIGA USTED DE SU PERSPECTIVA ¿CON QUE FINALIDAD SE REALIZÓ ESTA OPERACIÓN? CONTESTO:** *Con el fin de obtener divisas, para luego comprar bonos y manejar el mercado paralelo en Venezuela, asimismo con parte de ese dinero el señor Gorrín compró un banco en República Dominicana de nombre Asociación Peravia de Ahorros y Préstamo.* **CUARTA PREGUNTA**: *¿***QUE PERSONA EN ESPECIFICO SE REFIERE EN SU RESPUESTA ANTERIOR? CONTESTO:** *Al señor* **RAÚL GORRIN** *y* **GUSTAVO PERDOMO**, *ambos en un momento manejaban la Oficina del Tesoro, pues mantenían una estrecha amistad con el señor* **ALEJANDRO ANDRADE**, *quien los favorecía para que estos ciudadanos compraran bonos de la deuda pública nacional o cualquier otro título, para que los vendieran y las divisas recibidas como contraprestación del título eran vendidas en el mercado paralelo.* **QUINTA PREGUNTA: ¿DIGA USTED, SI LOS MENCIONADOS CIUDADANOS ERAN FUNCIONARIOS DE DICHA OFICINA? CONTESTO:** *Desconozco, esa información deben solicitarla directamente al Ministerio de Finanzas o a la Oficina Nacional del Tesoro.* **SEXTA PREGUNTA: ¿DIGA USTED, SI TIENE CONOCIMIENTO CUANTOS CONTRATOS FIRMO PDVSA CON LA EMPRESA RANTOR? CONTESTO:** *Creo que firmaron dos, pero con respecto al segundo no manejo los detalles, pido al Ministerio Público que investigue sobre este punto en particular,*

6

pues de haber firmado un segundo contrato el daño al patrimonio del Estado es mayor, asimismo solicito determine si además de las personas mencionadas existen otras personas vinculadas a estos hechos, y saber con certeza cuantos contratos bajo esta modalidad fueron firmados. **SEPTIMA PREGUNTA: ¿DIGA USTED, SI TIENE CONOCIMIENTO DONDE PUEDE SER UBICADO EL SEÑOR CARMELO URDANETA Y VICTOR AULAR? CONTESTO:** Solo puedo aportar al Ministerio Público, los números de teléfonos del señor **CARMELO URDANETA** y **VICTOR AULAR**, el primero registra el móvil **0414 338 54 19** y el segundo el nro. **0414 155 1343,** desconozco si actualmente siguen trabajando en PDVSA, con respecto al señor **GORRÍN** y su socio, aún y cuando no lo preguntan los mismos poder ser localizados en la Florida**,** sede del canal de noticias Globovisión...."

De acuerdo a la nueva información aportada por el denunciante en su entrevista, la operación de préstamo a interés bajo el mecanismo de línea de crédito, realizada entre Petróleos de Venezuela S.A. (PDVSA) y la empresa venezolana RANTOR CAPITAL, C.A., por un monto de siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.), se realizó con la finalidad de obtener divisas, para luego comprar bonos y manejar el mercado paralelo en Venezuela; asimismo indicó el denunciante que con parte de ese dinero el señor Gorrín compró un banco en República Dominicana de nombre Asociación Peravia de Ahorros y Préstamo. Al respecto, refiere el denunciante que los ciudadanos **RAÚL GORRIN** y **GUSTAVO PERDOMO** manejaban la Oficina del Tesoro, pues mantenían una estrecha amistad con el señor **ALEJANDRO ANDRADE**, quien los favorecía para que compraran bonos de la deuda pública nacional o cualquier otro título, los vendieran, y luego las divisas recibidas como contraprestación del título, fueran vendidas en el mercado paralelo.

Vistos estos elementos adicionales aportados por el denunciante, se procedió a realizar diversas diligencias de investigación, entre otras, se solicitó información a diversas instancias del Estado –Banco Central de Venezuela, Centro Nacional de Comercio Exterior, Oficina Nacional del Tesoro y Ministerio del Poder Popular de Economía y Finanzas-, acerca de si los ciudadanos RAÚL GORRIN y GUSTAVO PERDOMO –tal como lo indicó el denunciante-, fungen como adquirentes o propietarios de títulos o bonos de la deuda pública de Venezuela, de forma que su posterior comercialización pudiera haber afectado o incidido en el mercado paralelo de divisas en Venezuela.

Una vez recabadas las resultas de tales diligencias de investigación, quedó demostrado que los ciudadanos ut supra señalados no aparecen en los registros estatales relacionados con el manejo y comercialización de bonos y demás títulos. De igual forma, tampoco se reflejan sus datos entre los ciudadanos y

7



*empresas registradas como adquirentes de divisas, sobre ello profundizaremos infra..."*

**II**

**DE LA MOTIVACION PARA DECIDIR**

Interpone el Fiscal Septuagésimo Sexto (67°) Provisorio a Nivel Nacional con Competencia Plena del Ministerio Público, acto conclusivo por medio del cual solicita el decreto de sobreseimiento de la causa signada con el Nro. MP-193947-2017, en relación a los investigados ciudadanos **RAUL ANTONIO GORRIN, GUSTAVO PERDOMO y VICTOR EDUARDO AULAR BLANCO**, de conformidad con lo dispuesto en el artículo 300 numeral 1 del Código Orgánico Procesal Penal.

Así mismo, manifiesta el representante Fiscal en el folio cuatro (04) de su escrito de solicitud de sobreseimiento, que la presente causa tuvo su inicio en virtud de una denuncia efectuada por el ciudadano **LUIS ALEJANDRO TELLERIA**, y que en cuanto a esos hechos en especifico, esa representación se reserva el derecho de continuar la investigación y efectuar un pronunciamiento por separado.

Posteriormente, procede a señalar el representante Fiscal la existencia de una denuncia interpuesta por el ciudadano **OSCAR ADOLFO RONDEROS**, en su condición de Diputado Suplente de la Asamblea Nacional por el Estado Nueva Esparta, de fecha 14 de agosto de 2017, por medio de la cual entre otras cosas manifestó lo siguiente:

> *"...Ahora bien, ante este esquema de desvío de divisas ya ha sido profundamente investigado por el Ministerio Público y en algunos casos ya se han establecido responsabilidades y sanciones tanto personales como patrimoniales...pero he notado como venezolano preocupado que existe un punto ciego donde no se ha investigado y es la asignación de divisas directamente por PETROLEOS DE VENEZUELA (PDVSA) a particulares sin cumplir con el régimen cambiario existente y sobre este punto en especifico para no entrar en*

8

*especulaciones quiero referirme en concreto en una operación por SIETE MIL DOSCIENTOS MILLONES DE BOLIVARES (Bsf 7.200.000.00) pagaderos en dólares, realizada presuntamente por PDVSA en contra del patrimonio de todos los venezolanos...*

*Omissis...*

*De dicho reportaje surge la necesidad imperiosa de investigar los pormenores sobre la existencia real de esta operación...la vinculación o no de las empresas RAPTOR CAPITAL C.A. y EATON GLOBAL SERVICES LIMITED con dicha operación...si la misma estaba ajustada al ordenamiento legal venezolano y si finalmente surgió una malversación o perjuicio en contra del patrimonio del estado administrado por PDVSA..."*

Al respecto, se hace necesario proceder a evaluar lo cursante en las actuaciones, las diligencias de investigación y lo explanado en el escrito de solicitud fiscal:

1. Se inicia la presente causa en virtud de denuncia formulada el 08 de marzo de 2017, por ante el Despacho de la Fiscalía General de la República Bolivariana de Venezuela, por el ciudadano **LUIS ALEJANDRO TELLERIAS DORANTE**. (Folio 04 al 18 de la pieza Nro. 1).

2. Cursa a los folios diecinueve (19) al veinticuatro (24) de la pieza Nro. 1, denuncia interpuesta por el ciudadano **OSCAR ADOLFO RONDEROS RANGEL** en su carácter de Diputado Suplente de la Asamblea Nacional por el Estado Nueva Esparta, ante la Dirección Contra la Delincuencia organizada del Ministerio Público, el 17 de octubre de 2017, mediante la cual solicitó la investigación de unos hechos relacionados con una operación realizada por la empresa Petróleos de Venezuela S.A., por la cantidad de siete mil doscientos millones de bolívares (7.200.000.000,00), pagaderos en dólares.

9

3. Acta de entrevista cursante al folio veintiocho (28) y su vuelto de la pieza Nro. 1, rendida por el ciudadano **OSCAR ADOLFO RONDEROS RANGEL**, el 06 de octubre de 2017, en su carácter de denunciante.

4. Acta de entrevista rendida por el ciudadano **VICTOR EDUARDO AULAR BLANCO**, el 17 de octubre de 2017, por ante el Despacho de la Fiscalía Vigésima Segunda (22°) Nacional del Ministerio Público.

5. Cursa a los folios treinta y siete al treinta (37) al treinta y ocho (38) de la referida pieza, oficio Nro. CJ-2017, de fecha 06 de noviembre de 2017, suscrito por la ciudadana VICKY ZARATE, en su carácter de Consultora Jurídica de PDVSA, mediante el cual notifica al Fiscal Vigésimo Segundo (22°) del Ministerio Público a Nivel Nacional con Competencia Plena lo siguiente:

> *"...En virtud del referido requerimiento se procedió a realizar las gestiones con la unidad de Auditoría Interna de PDVSA y se obtuvo lo siguiente:*
>
> *1. Con relación a lo indicado, en fecha 06 de noviembre de 2017, la Unidad de Auditoría Interna de PDVSA, remitió lo siguiente:*
>
> 1. *Copia del Contrato de fecha 17 de diciembre de 2014, donde PDVSA suscribió un préstamo a interés bajo el mecanismo de línea de crédito, con la sociedad mercantil RANTOR CAPITAL C.A., por un monto de SIETE MIL DOSCIENTOS MILLONES DE BOLIVARES (7.200.000.000,00)...*
> 2. *Copia de la resolución del comité Ejecutivo de PDVSA en reunión No. 2014-51, celebrada el 15 de diciembre de 2014, donde se autoriza la suscripción y ejecución por parte de Petróleos de Venezuela, S.A., de un Contrato de Préstamo a interés bajo el mecanismo de Línea de Crédito...".*

6. Cursa a los folios cuarenta y dos (42) al cuarenta y siete (47) de la pieza Nro. 1, Documento constitutivo estatutario de la empresa **RANTOR CAPITAL C.A.**, registrado ante el Registro Mercantil Segundo del Estado Anzoátegui.

10

7. Cursa a los folios cincuenta y seis (56) al cincuenta y siete (57) de la pieza Nro. 1, memorándum dirigido a la ciudadana **VICKY ZARATE** en su carácter de consultora Jurídica de PDVSA, suscrito por el ciudadano **CESAR A. MILANO** en su carácter de auditor general de la referida empresa, de fecha 07/12/2017, mediante el cual se deja constancia de lo siguiente:

> *"...Me es grato dirigirme a ustedes en la oportunidad de responder a su solicitud de fecha 27/10/2017, a los fines de apoyar en la investigación que adelanta el Ministerio Público y dar respuesta...*
> *1. PETROLEOS DE VENEZUELA S.A. (PDVSA), pago en su totalidad lo adeudado por concepto del contrato de préstamos a interés bajo el mecanismo de línea de crédito que mantenía con la empresa Rentor Capital, C.A., por un monto de siete mil doscientos millones de bolívares (7.200.000.000,00), anexo se lo remito copia de los pagos.*
> *2. Acerca del referido contrato de préstamo bajo el mecanismo de línea de crédito podría ser pagado en divisas, cabe destacar que esta operación al igual que otras de características similares fueron analizadas por la Consultoría Jurídica de PDVSA en su oportunidad, así como por asesores externos y auditada en forma independiente por la firma de servicios profesionales KPMG, encontrando que dicha operación se realizó de acuerdo al ordenamiento legal vigente a la fecha, anexo le remito copia de las opiniones de dos escritorios jurídicos reconocidos... y los estados financieros de PDVSA con el dictamen de los contadores públicos independientes de KPMG, donde se ve reflejada la operación objeto de esta comunicación.*
> *3. Existen antecedentes de transacciones similares efectuadas por PDVSA, se puede evidenciar en los estados financieros auditados de PDVSA...*
> *4. La tasa considerada por PDVSA para el pago de la operación sujeta a revisión fue de 6.30 Bs. por 1$."*

8. Contrato de préstamo bajo la modalidad de línea de crédito, efectuado el 17 de diciembre de 2014, celebrado entre la empresa **PETROLEOS DE VENEZUELA S.A.**, parte deudora, representada en ese acto por el ciudadano **VICTOR EDUARDO AULAR** actuando en su carácter de Director de la referida empresa *"...según designación efectuada*

11

*mediante Decreto No...de fecha 24 de mayo de 2011, publicado en Gaceta oficial No. 39.681, de fecha 25 de mayo de 2011...*", y la empresa **RANTOR CAPITAL C.A.**, parte prestamista, representada en ese acto por el ciudadano **JOSE MANUEL CERRO** en su carácter de Director General de la referida empresa, por medio del cual acordaron un préstamo por la cantidad de siete mil doscientos millones de bolívares (7.200.000.000). (Folios veintidós (22) al cuarenta y siete (47) de la pieza Anexo 1).

9. Cursa al folio cuarenta y ocho (48) de la pieza denominada anexo 1, comunicación suscrita por la ciudadana **LETRICIA N. LAMB**, en su carácter de Directora de la empresa **EATON GLOBAL SERVICES LIMITED**, de fecha 30 de diciembre de 2014, dirigida al ciudadano **VICTOR AULAR** en su carácter de vicepresidente de Finanzas de la empresa Petróleos de Venezuela S.A., a los fines de notificarle que el 30 de diciembre de 2014, la empresa **RANTOR CAPITAL C.A.**, cedió los derechos de acreencia en virtud del contrato de préstamo suscrito el 17 de diciembre de 2014, mediante el cual la empresa **RANTOR** le otorgó un préstamo por la cantidad de siete mil doscientos millones de bolívares (7.200.000.000).

10. Cursa a los folios cuarenta y nueve (49) al cincuenta y dos (52) de la pieza denominada anexo 1, contrato de cesión de derechos de crédito suscrito entre la empresa **RANTOR CAPITAL C.A.**, y la empresa **EATON GLOBAL SERVICES LIMITED**, mediante el cual se dejó constancia entre otros tópicos de lo siguiente:

> *"...RANTOR cede en este acto a EATON los derechos de crédito que le corresponden respecto de Petróleos de Venezuela S.A....según contrato de préstamo a intereses bajo el Mecanismo de Línea de Crédito suscrito entre PDVSA y RANTOR el 17 de diciembre de 2014..."*

12

12. Cursa a los folios ciento cincuenta y nueve (159) al ciento sesenta y seis (166) de la pieza 1, informe suscrito por la ciudadana **SOHAIL HERNANDEZ PARRA** en su carácter de Primera Vicepresidente Gerente del Banco Central de Venezuela, dirigido al Fiscal Sexagésimo Séptimo (67º) del Ministerio Público, de fecha 12 de marzo de 2020, a los fines de dar repuesta al oficio Nº 00-DCC-F67-0185-2020, de fecha 27 de febrero de 2020.

13. Cursa al folio ciento setenta y tres (173) de la pieza 1, comunicación suscrita por el ciudadano **GISKENDALL VARGAS LOPEZ** en su carácter de Vicepresidenta del Centro Nacional de Comercio Exterior CENCOEX, dirigida al Fiscal Septuagésimo Séptimo (67º) del Ministerio Público, recibida por ese despacho fiscal el 29 de junio de 2020, mediante la cual deja constancia de lo siguiente: *"...en atención a su solicitud, y luego de una exhaustiva revisión de los archivos físicos y digitales...no se evidencia que los ciudadanos Raúl Gorrín y Gustavo Perdomo, hayan sido beneficiados a través de procesos de adjudicación o liquidación de divisas llevados por el Centro Nacional de Comercio Exterior (CENCOEX)."*.

14. Informe pericial contable emitido por la División de Experticias Contables Financieras, del Cuerpo de Investigaciones Científicas, Penales y Criminalísticas, solicitada por el despacho de la Fiscalía Septuagésima Séptima (67º) del Ministerio Público a Nivel Nacional con Competencia Plena, de fecha 19 de junio de 2020, suscrita por los expertos comisionados ciudadanos **WUASCAR MAYORA y ADRIAN PARRA**, cursante a los folios uno (01) al veinte de la pieza denominada anexo 1, mediante la cual se dejó constancia de lo siguiente:

> *"...1. MOTIVO DE LA EXPERTICIA*
> *Realizar experticia Contable a fin de que se verifique los siguientes aspectos:*
> - *Si PDVSA, recibió la totalidad del monto señalado en el contrato celebrado el 16 de Diciembre de 2014, con la*

13

*empresda Rantor Capital C.A. y si fue debidamete acreditado en sus cuentas bancarias.*
- *Si dicho contrato fue cancelado en su totalidad.*
- *Informar si el contrato en cuestión genero ganacias o perdida contale para la empresa.*
*Omissis...*

## V. CONCLUSIONES:

1. *Que en fecha 15 de Diciembre de 2014, el comité ejecutivo autorizó al ciudadano Victor Aular Blanco...en su carácter de vicepresidente de la empresa Petróleos de Venezuela, S.A., a suscribir y ejecutar un Contrato de Préstamo a Interese, bajo el mecanismo de Línea de Crédito hasta la cantidad de Siete Mil Doscientos Millones de Bolivares...con la Empresa Rantor Capital, C.A...*
3. *Que la empresa Petróleos de Venezuela S.A., recibió desde el 19/12/2014 hasta el 12/01/2015, notas de crédito por la cantidad total de ....*
4. *Que esta cantidad es lo equivalente en Dólares americanos a Un Mil Ciento Cuarenta y Dos Millones Ochocientos Cincuenta y Siete Mil Ciento Cuarenta y Un Dólar con Veitisiete Centavos...*
5. *Que existe un contrato de Sesion (sic) entre Rantor Capital y Eaton Global Service Limited...*

*10. Que la empresa obtuvo ganancia por pago anticipado de financiamiento que asciende a la cantidad de Tres Mil Cuatrocientos Veinte Tres Millones Seiscientos Sesenta y Dos Mil Trescientos Cincuenta y Cuatro Bolívares Fuertes con Tres Céntimos (Bs. 3.423.662.354,03), producto de haber cancelado de forma anticipada el préstamo recibido...*
*11. Que existe un informe elaborado por la firma de Abogados Hogan Lovells, sobre el análisis de operaciones de préstamo a interés mediante la modalidad de línea de crédito, en año 2012, a los fines de llevar a cabo el análisis del contenido del contrato...que bajo la ley venezolana no se requiere autorización expresa del Deudor para efectivamente realizar una cesión de derecho...*
*12. Que según Informe de Auditoría realizado por los contadores Públicos Independientes, RODRIGUEZ VELASQUEZ & ASOCIADOS, (KPMG), de fecha 30 de marzo de 2015, dirigido a los Accionistas y Junta directiva de Petróleos de Venezuela S.A., que dicho auditores determinaron que la mencionada empresa obtuvo ganancia en los ejercicios económicos en años terminados, 2014, 2013, y 2012, por préstamos pagados en forma anticipada..."*

14

15. Cursa al folio veintiuno (21) de la pieza denominada anexo 1, comunicación dirigida al ciudadano **VICTOR AULAR**, en su carácter de Vicepresidente de la empresa Petróleos de Venezuela S.A., suscrita por el ciudadano **HUMBERTO PERNICIARIO** en su carácter de secretario de la referida empresa, donde se explanó como motivo de asunto del respectivo documento: "...*CONTRATO DE PRESTAMO A INTERES BAJO EL MECANISMO DE LINEA DE CREDITO...*", con copia dirigida a los ciudadanos **EULOGIO DEL PINO** en su carácter de Presidente de la referida empresa, **JESUS LUONGO** Director y **ORLANDO CHACIN**, Director, mediante la cual se dejó constancia de lo siguiente:

> "...*Cumplo con informales que el Comité Ejecutivo en su Reunión Nº 2014-51, celebrada el día 15/12/2014...Autorizar la suscripción y ejecución por parte de Petróleos de Venezuela S.A., de un Contrato de Préstamo a Interés bajo el mecanismo de Línea de Crédito, hasta por la cantidad de Siete Mil doscientos Millones de bolívares (Bs. 7.200.000.000,00) con la empresa Rentor Capital C.A., y autorizar al ciudadano Víctor Aular Blanco...en su carácter de vicepresidente, a fin de que suscriba el documento correspondiente, constituya los instrumentos que sean requeridos, incluyendo cartas de crédito...*"

Ahora bien, una vez analizados los ut supra mencionados documentos que cursan en las presente actuaciones, este Juzgado ha verificado y considera que el representante Fiscal efectuó múltiples diligencias de investigación con el objeto de esclarecer los hechos denunciados. Así mismo, que realizó las debidas peticiones de colaboración a los organismos necesarios, denotándose utilidad, necesidad y pertinencia en dichas peticiones con el objeto del real esclarecimiento de los hechos.

En este sentido, conforme a la solicitud fiscal se evidencia que los hechos objeto de análisis en la presente decisión están referidos en primer término, a la suscripción en fecha 17 de diciembre de 2014, de un

15

contrato de interés bajo el mecanismo de linea de crédito, entre la empresa Petróleos de Venezuela S.A. **(PDVSA)** y la empresa venezolana **RANTOR CAPITAL, C.A**., por un monto de siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.), cuyo derecho de acreencia, fue posteriormente cedido a la empresa **EATON GLOBAL SERVICES LIMITED**, a quien **PDVSA** le canceló el referido préstamo en divisas (Euros); y en segundo lugar, a la presunta compra por parte de los ciudadanos **RAÚL GORRIN** y **GUSTAVO PERDOMO** -con las divisas obtenidas por el pago del préstamo realizado a PDVSA-, de bonos de la deuda pública venezolana.

Sobre tales hechos, es preciso señalar que este juzgadora luego de haber revisado exhaustivamente las actuaciones cursantes en el expediente contentivo de la presente investigación, estima que se encuentran plenamente acreditadas –entre otras- las siguientes circunstancias fácticas:

- Que en fecha **17 de diciembre de 2014,** fue suscrito un contrato de préstamo a interés bajo el mecanismo de linea de crédito, entre **Petróleos de Venezuela S.A. (PDVSA)** y la empresa venezolana **RANTOR CAPITAL, C.A**., por un monto de siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.). Cursante a los folios veintidós (22) al cuarenta y siete (47) de la pieza Anexo 1.

- Que quienes suscriben el referido contrato fueron los ciudadanos **VICTOR AULAR BLANCO** Vicepresidente de Finanzas de PDVSA y **JOSÉ MANUEL CERRO**, titular del pasaporte N° E-13588986-B, actuando en su carácter de Director General de la empresa **RANTOR CAPITAL C.A**., quienes se encontraban autorizados para ello; el primero mediante autorización otorgada por el Comité Ejecutivo de PDVSA en su reunión N° 2014-51, de fecha 15-12-2014, la cual le fue notificada a éste mediante comunicación CONFIDENCIAL de fecha 15 de diciembre de 2014 suscrita por el ciudadano Humberto Perniciano, Secretario del Comité Ejecutivo de

16

Petróleos de Venezuela S.A. (PDVSA), cursante al folio veintiuno de la pieza denominada anexo; y el segundo, en su condición de Director General de la señalada empresa según lo que se verifica del acta constitutiva de la segunda de las empresas señaladas, cursante a los folios cuarenta y dos (42) al cuarenta y ocho (48) de la pieza Nro 1, de las actuaciones.

- Que entre los representantes y directivos de la empresa **RANTOR CAPITAL C.A**., no figuran los ciudadanos Raúl Gorrín y Gustavo Perdomo, de acuerdo al Acta Constitutiva y Estatutos Sociales de la referida empresa, los cuales cursan a los folios cuarenta y dos (42) al cuarenta y ocho (48) de la pieza Nro 1.

- Que en fecha del 30 de diciembre de 2014, **RANTOR CAPITAL, C.A.,** cedió sus derechos como acreedor de **PDVSA**, por medio de un contrato de cesión de crédito a otra empresa llamada **EATON GLOBAL SERVICES LIMITED,** todo lo cual puede verificarse en comunicación cursante al folio cuarenta y ocho (48) de la pieza denominada anexo 1, suscrita por la ciudadana LETRICIA N. LAMB en su carácter de directora de la referida empresa dirigida al ciudadano VICTOR AULAR en su carácter de Vicepresidente de Finanzas de Petróleos de Venezuela S.A., así como en contrato suscrito entre las referidas empresas cursante a los folios cuarenta y nueve (49) al cincuenta y dos (52) de la pieza anexo 1.

- Que el préstamo fue entregado en su totalidad en bolívares por RANTOR CAPITAL C.A. a PDVSA, mediante diversas transferencias durante el período comprendido entre el 19 de diciembre de 2014, y el 12 de enero de 2015, tal como consta en los movimientos bancarios de las cuentas de PDVSA en los Bancos Mercantil y Provincial, así como en el listado de ingresos recibidos aportado por PDVSA. En este sentido, se observa que PDVSA recibió ingresos en sus cuentas derivados del contrato de préstamo objeto de la presente investigación, por un monto total de siete mil ciento

17

noventa y nueve millones novecientos noventa y nueve mil novecientos noventa Bolívares (7.199.999.990,00 Bs.), lo cual abarca la totalidad del préstamo, y que calculado a la tasa de cambio vigente para la fecha era un mil ciento cuarenta y dos millones ochocientos cincuenta y siete mil ciento cuarenta y un dólares con veintitrés céntimos (1.142.857.141,23 Dólares), todo lo cual se verifica del informe pericial contable cursante a los folios uno (01) al veinte (20) de la pieza anexo 1.

- Que el contrato de cesión le fue notificado formalmente en fecha 30 de diciembre de 2014 a la Vicepresidencia de Finanzas de PDVSA, por la representante y directora de la empresa **EATON GLOBAL SERVICES LIMITED**, Letricia N. Lamb, quien indicó además que por cuanto **EATON GLOBAL SERVICES LIMITED** era una empresa constituida en Hong Kong y no poseía cuenta en moneda de curso legal en Venezuela, por lo que los pagos del préstamo otorgado a **PDVSA** podrían ser recibidos en dólares o en cualquier otra moneda convertible, informando por tanto cuáles eran las cuentas en las que podría ser realizado el pago del préstamo otorgado a PDVSA. (folio cuarenta y ocho (48) de la pieza denominada anexo 1).

- Que **EATON GLOBAL SERVICES LIMITED** recibió de **PDVSA** pagos en distintas fechas, desde el 29 de diciembre de 2014, hasta el 02 de febrero de 2015**,** por un monto de Quinientos Once Millones Novecientos Trece Mil Doscientos Setenta Euros con Setenta y Cuatro Céntimos de Euros (EUR. 511.913.270,74), equivalentes a seiscientos millones de dólares americanos (600.000.000,00 US $), tal como consta en las órdenes de pago emitidas por PDVSA, en las que se describen todos los pagos realizados a las cuentas aportadas por EATON GLOBAL SERVICES LIMITED para la cancelación del préstamo que fuera entregado en su totalidad a PDVSA, todo lo cual se desprende de la experticia contable emitida por la División de Experticias Financieras.

18

- Que el monto pagado por PDVSA a **EATON GLOBAL SERVICES LIMITED**, por concepto del préstamo otorgado, fue calculado a la tasa de cambio oficial para la fecha del pago, la cual era de seis bolívares con treinta céntimos por dólar (6,30 Bs. por 1 $), tal como fue acreditado en el Informe Pericial Contable realizado por expertos del Cuerpo de Investigaciones Científicas, Penales y Criminalísticas.

- Que la empresa Petróleos de Venezuela S.A. (PDVSA)-, en fecha anterior al contrato suscrito entre Rantor Capital C.A. y PDVSA, había suscrito otros contratos de préstamo a interés bajo la modalidad de línea de crédito (entre otros el contrato de préstamo efectuado entre Petróleos de Venezuela S.A. (PDVSA) y Administradora Atlantic 17107 C.A., así como el contrato de cesión entre Administradora Atlantic 17107 C.A. y Violet Advisors S.A. en fechas 12 y 15 de marzo de 2012, respectivamente), todo lo cual puede vislumbrarse en informe levantado por el escritorio HOGAN LOVELLS, mediante el cual se deja constancia la opinión jurídica respecto a un análisis de operación de préstamo a interés mediante la modalidad de línea de crédito, cursante e los folios ciento cuarenta y cinco (145) al ciento cincuenta y tres (153) de la pieza denominada anexo 1.

- Que **PDVSA** al haber cancelado el préstamo de manera anticipada –antes de los 180 días del primer desembolso- se hizo acreedora de un descuento del 47,5 % del monto total del préstamo, que calculado en dólares a la tasa de cambio oficial para la fecha, era de un mil ciento cuarenta y dos millones ochocientos cincuenta y siete mil ciento cuarenta y un dólares con veintitrés céntimos (1.142.857.141,23 Dólares). Por tanto, PDVSA obtuvo ganancias por Tres Mil Cuatrocientos Veintitrés Millones Seiscientos Sesenta y Dos Mil Trescientos Cincuenta y Cuatro Bolívares Fuertes con Tres Céntimos (3.423.662.353,03 Bs F), en virtud de haberse acogido a la cláusula del pronto pago, tal como concluyó el Informe Pericial Contable realizado por funcionarios adscritos a la División de Experticias

19

Contables y Financieras del Cuerpo de Investigaciones Cientificas, Penales y Criminalísticas, cursante a los folios uno (01) al veinte (20) de la pieza denominada anexo 1.

- Que en los Estados Financieros Consolidados de PDVSA al   31 de diciembre de 2014, auditados por la firma de Auditores y Contadores KPMG, se concluyó específicamente doscientos dieciséis (216) de la pieza anexo 1, lo siguiente: "...*Ganancia por Pago Anticipado de Financiamiento Durante los años terminados el 31 de diciembre de 2014, 2013 y 2012, PDVSA recibió financiamientos en bolívares de entidades privadas no financieras, a un plazo de 24 meses y una tasa de interés resultante de restar 3% a la tasa activa del mercado, conforme con el promedio de los seis principales bancos del país, publicado por el BCV. Durante el año terminado el 31 de diciembre de 2014, estos préstamos fueron pagados de forma anticipada, generando una ganancia de $477 millones (Bs.9.931 millones) [$1.100 millones (Bs.6.699 millones) en 2013 y $1.978 millones (Bs.8.505 millones) en 2012]...*" el cual corre inserto a los folios ciento ochenta y tres (183) al trescientos nueve (309) de la pieza anexo 1.

- Que conforme a los datos aportados Banco Central de Venezuela y el Centro Nacional de Comercio Exterior del Ministerio del Poder Popular de Economía y Finanzas, los ciudadanos **RAÚL GORRIN** y **GUSTAVO PERDOMO**, así como la empresa **RANTOR CAPITAL C.A**. no aparecen en los registros estatales relacionados con el manejo y comercialización de bonos y demás títulos de la deuda pública de la República Bolivariana de Venezuela, todo lo cual puede verificarse en informe emitido por la ciudadana **SOHAIL HERNANDEZ PARRA** en su carácter de vicepresidenta del Banco Central de Venezuela, cursante a los folios ciento cincuenta y nueve (159) al ciento sesenta y tres (163) de la pieza N° 1, mediante el cual se señaló entre otras cosas lo siguiente:

20



> *"...en torno a lo solicitado en el numeral 1 de su comunicación, de la revisión efectuada a la base de datos de los títulos custodiados a través del Sistema de Custodia Electrónica de Títulos (SICET), administrado por el Departamento de Valores adscrito a la Gerencia de Tesorería de la Vicepresidencia de Operaciones Nacionales de este instituto, no se observó registro alguno asociado a las cédulas de identidad Nros. V-8.682.996 y V-14.585.388 y al RIF Nº J-401126090-0, durante el periodo comprendido desde el 14/08/2012, (inicio del registro de custodia a nivel de tenedor final) hasta el 27/02/2020. Asimismo, en la base de datos que tiene el Banco Central de los títulos colocados en el mercado primario y custodiados en el mercado externo, tampoco se encontraron registros que coincidan con la cédula....mientras que para la cédula de identidad Nº V-14.585.388, se evidenció una orden de compra del instrumento PETROBONO 2011, por un monto de USD 600.000, la cual no resultó adjudicada, tal como se desprende del reporte constante de un (1) folio útil que se adjunta a la presente debidamente certificado..."*

- Así mismo, del referido informe se desprende que las divisas que le fueron liquidadas al ciudadano Raúl Gorrín corresponden a los años 2002 y 2003, siendo los conceptos de tales operaciones: servicios de transporte, viajes y turismo y remesas al exterior; y con respecto al ciudadano Gustavo Perdomo, sólo se refleja una orden de compra por un PETROBONO por seiscientos mil dólares (600.000,00 $) la cual nunca fue adjudicado.

En función de ello, esta juzgadora pasa a resolver la **SOLICITUD DE SOBRESEIMIENTO** presentada por el Ministerio Público en los siguientes términos:

El artículo 305 del Código Orgánico Procesal Penal, prevé que:

> *"...Presentada la solicitud de sobreseimiento, el Juez o Jueza la decidirá dentro de un lapso de cuarenta y cinco días. La decisión dictada por el tribunal deberá ser notificada a las partes y a la víctima aunque no se haya querellado..."*

21

En éste sentido, dispone el artículo 11 del Código Orgánico Procesal Penal, que la acción penal corresponde al Estado a través del Ministerio Público, institución esta que por tanto emerge conforme a las normas del Código Orgánico Procesal Penal, como el titular de la acción penal y por tanto como el director de la primera fase del proceso como lo es la de investigación, cuya finalidad, claro está luego de iniciada la investigación por cualquiera de los modos de proceder –denuncia, oficio <*Noticia Criminis*> o querella-, consiste en hacer constar todos los hechos o circunstancias útiles que permitan tanto la inculpación de o los imputados así como aquellos que sirvan para exculparle; precisamente de allí que el artículo 262 del Código Orgánico Procesal Penal señala que su objeto consiste en " *la preparación del juicio oral y público, mediante la investigación de la verdad y la recolección de todos los elementos de convicción que permitan fundar la acusación del fiscal y la defensa del imputado*".

Así pues, el Ministerio Público tiene bajo su responsabilidad un rol fundamental en la viabilidad del proceso penal, por cuanto en principio es el llamado a presentar el acto conclusivo correspondiente de acuerdo a los resultados de la investigación que precedentemente haya dirigido lo cual claramente se encuentra establecido en el artículo 265 del Código Orgánico Procesal Penal, el cual establece que *"...El Ministerio Público, cuando de cualquier modo tenga conocimiento de la perpetración de un hecho punible de acción pública, dispondrá que se practiquen las diligencias tendientes a investigar y hacer constar su comisión, con todas las circunstancias que puedan influir en su clasificación y la responsabilidad de los autores o autoras y demás partícipes..."*.

Una vez llevada a término la investigación, sus resultas quedan sometidas a la objetiva evaluación por parte del representante Fiscal, quien atendiendo a la naturaleza de los hechos y los elementos de

22

convicción arrojados, pondrá fin a tal fase mediante la presentación de cualquiera de los tres actos conclusivos previstos en los artículos 297, 300 y 308 del Código Orgánico Procesal Penal, es decir, archivo fiscal, sobreseimiento, y acusación, los cuales plantean naturalezas y supuestos de procedencia distintos.

Ahora bien, tratándose la presente causa de la solicitud de sobreseimiento solicitado por el Ministerio Público, resulta necesario acotar que el mismo constituye una acto conclusivo cuyos efectos consisten en poner fin o termino a la investigación llevada a cabo por el Despacho Fiscal, cuando considere la existencia de causas dentro del hecho investigado que imposibilitan la continuación de la misma, cuyos supuestos de procedencia están perfectamente contempladas en el artículo 300 del Código Orgánico Procesal Penal que al efecto señala:

> "*Artículo 318. Sobreseimiento. El sobreseimiento procede cuando:*
> *1. El hecho objeto del proceso no se realizó o no puede atribuírsele al imputado;*
> *2. El hecho imputado no es típico o concurre una causa de justificación, inculpabilidad o de no punibilidad;*
> *3. La acción penal se ha extinguido o resulta acreditada la cosa juzgada;*
> *4. A pesar de la falta de certeza, no exista razonablemente la posibilidad de incorporar nuevos datos a la investigación, y no haya bases para solicitar fundadamente el enjuiciamiento del imputado;*
> *5. Así lo establezca expresamente este Código.". Subrayado propio.*

Así pues, se evidencia que el sobreseimiento en cuestión fue fundamentado de conformidad con los numerales 1° y 2°, siendo que el primero de éstos manifiesta que el hecho investigado denunciado como posible conducta típica no se haya realizado y el segundo de estos, como que esos hechos no puedan ser encuadrados dentro de un tipo penal, lo cual hace referencia a aquellas situaciones en las cuales no existe relación de perfecta correspondencia entre la conducta humana desarrollada por la

23

persona o personas denunciadas y los tipos previstos en nuestro Código Penal y en las leyes especiales, el cual necesariamente por aplicación del principio de legalidad de los delitos y las penas, da lugar al sobreseimiento del hecho <*Nullum Crimen Nulla Poena Sine Lege*>.

En éste sentido, debe delimitarse que de la investigación efectuada por el representante Fiscal, ciertamente se pudo constatar la existencia fáctica de una contratación efectuada por la empresa **PETROLEOS DE VENEZUELA S.A.** (PDVSA) con la empresa **RANTOR CAPITAL C.A.**, de préstamo a interés bajo la modalidad de línea de crédito, el 17 de diciembre de 2017, el cual fue suscrito entre el ciudadano **VICTOR EDUARDO AULAR** quien fungía en esa oportunidad como director de la primera de las nombradas, debidamente autorizado según se evidencia en comunicación cursante al folio veintiuno (21) de la pieza anexo 1, del cual se desprende que tal contratación contaba con el aval del Comité Ejecutivo de la empresa, conforme a la cláusula Vigésima Séptima de los Estatutos Sociales de PDVSA, mediante el cual se establecen las atribuciones de la Junta Directiva entre las cuáles se prevee: *"...5. Autorizar la celebración de contratos..."*.

Así mismo, del contenido del referido contrato cursante a los folios veintidós (22) al cuarenta y siete (47) de la pieza denominada anexo 1, se desprende lo siguiente: *"...Entre PETROLEOS DE VENEZUELA S.A. (el deudor)...representada en este acto por el ciudadano VICTOR EDUARDO AULAR BLANCO...titular de la cédula de identidad No. V-6.835.572, actuando en su carácter de Director de la referida sociedad mercantil, según designación efectuada mediante decreto No....de fecha 24 de mayo de 2011, publicado en Gaceta oficial Nº 39.681, de fecha 25 de mayo de 2011, y suficientemente autorizado para ese acto según se desprende de lo acordado en la reunión No. 2014-51 del Comité Ejecutivo de la empresa celebrada el 16/12/2014..."*.

24

Adicionalmente, de la extensa investigación efectuada por la representación fiscal se pudo constatar que los ciudadanos **RAUL ANTONIO GORRIN** y **GUSTAVO PERDOMO**, no tuvieron participación expresa en la referida contratación, ni poseían relación con la empresa **RANTOR CAPITAL C.A.**. Así mismo, que los referidos ciudadanos no adquirieron bonos ni títulos valores para la fecha de la vigencia de la referida contratación, conforme a lo que se desprende del extenso informe emitido por la Primera Vicepresidenta Gerente del Banco Central de Venezuela, cursante al folio ciento cincuenta y nueve (159) de la pieza 1.

Así mismo, se deriva del informe pericial contable emitido por la División de Experticias Contables Financieras del Cuerpo de Investigaciones Científicas, Penales y Criminalísticas que corre inserto a los folios uno (01) al veinte (20) de la pieza anexo 1, que a la empresa PDVSA con la referida contratación, no se le causó un daño patrimonial, verificándose específicamente en el punto Nro. 10 de las conclusiones del referido informe lo siguiente: "...*Que la empresa obtuvo una ganancia por pago anticipado de financiamiento que asciende...producto de haber cancelado de forma anticipada el préstamo recibido...*". Ello también se evidencia, del informe emitido por la compañía consultora Rodríguez Velásquez & Asociados (KPMG), específicamente al folio doscientos dieciséis (216) de la pieza anexo 1.

Aunado a ello, de la comunicación N° CJ-2017, de fecha 07 de diciembre de 2017, suscrita por la Consultora Jurídica de PDVSA cursante al folio cincuenta y cuatro (54) al cincuenta y cinco (55) de la pieza N° 1, se evidencia lo siguiente:

> "...2. Con relación al punto 2) sobre si el referido contrato de Préstamo a Interés Bajo el Mecanismo de Línea de Crédito podía ser pagado en divisas, podemos mencionar que esta operación

25



> *al igual que otras de características similares fueron analizadas por la Consultoría Jurídica de PDVSA, en su oportunidad, así como por asesores externos y auditada de forma independiente por la firma de servicios profesionales KPMG, encontrando que dicha operación se realizó de acuerdo con el ordenamiento legal vigente a la fecha, anexo le remito opiniones de dos escritorios jurídicos reconocidos, Hogan Lovells y Adrián & Adrián Abogados Consultores S.A. y los estados financieros de PDVSA con el dictamen de los contadores públicos independientes de KPMG.*
>
> *3. En cuanto al punto 3) existen antecedentes de transacciones similares efectuadas por PDVSA, se puede evidenciar en los estados financieros auditados de PDVSA. Con el objeto de ser más precisos en cuanto a los antecedentes remitimos copia del contrato suscrito entre PDVSA y  ADMINISTRADORA ATLANTIC 17107 C.A."*

De modo que, conforme lo expuesto por la Consultoría Jurídica de la empresa Petróleos de Venezuela S.A. (PDVSA), la realización de ese tipo de contratos de préstamo a interés bajo la modalidad de línea de crédito y su posterior pago en divisas, había sido ya analizado tanto por esa instancia, como por la firma de servicios profesionales **KPMG** y dos escritorios jurídicos reconocidos, Hogan Lovells y Adrián & Adrián Abogados Consultores S.A., dada la suscripción de otro contrato de préstamo a interés bajo la modalidad de línea de crédito, el cual había sido suscrito por **PDVSA** en fecha previa al que suscribió con **RANTOR CAPITAL C.A.**, habiendo entonces encontrado que dicha operación se encontraba de acuerdo con el ordenamiento legal vigente a la fecha.

Ahora bien, en base al argumento efectuado por la parte denunciante mediante el cual considera un ilícito el pago de obligaciones contractuales por parte de PDVSA en divisas extranjeras, el artículo 128 de la Ley del Banco Central de Venezuela establece que "*Los pagos estipulados en monedas extranjeras se cancelan, **salvo convención especial**, con la entrega de lo equivalente en moneda de curso legal, al tipo de cambio corriente en el lugar de la fecha de pago*". De manera que,

26

conforme a la citada norma, existe la posibilidad de pactar obligaciones en moneda extranjera.

Ello ha sido además reafirmado por nuestra Sala Constitucional del Tribunal Supremo de Justicia, entre otras en la sentencia de fecha 2 de noviembre de 2011, Exp. 09-1380, en la que señaló:

> "...*se considera que la inserción de las políticas cambiarias no invalidó las contrataciones pactadas en moneda extranjera pagaderas dentro del territorio de la República, sino que modificó su cumplimiento...en Venezuela no está expresamente prohibida la celebración de pactos cuyo cumplimiento, sea estipulado en moneda extranjera, siempre y cuando los mismos se adapten al marco cambiario existente*".

Así las cosas, debemos recapitular que en caso objeto de análisis tenemos un primer contrato de préstamo a interés bajo la modalidad de línea de crédito suscrito entre las empresas **PDVSA** y **RANTOR CAPITAL C.A.**, en el cual se estableció el monto del préstamo en bolívares, a saber: siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.), y luego un segundo contrato de cesión de acreencia del referido préstamo entre **RANTOR C.A.** y **EATON GLOBAL LIMITED SERVICES**, el cual corre inserto a los folios cuarenta y nueve (49) al cincuenta y dos (52) de la pieza anexo 1, donde se prevé el monto total de la acreencia en dólares americanos, siendo éste: un mil ciento cuarenta y dos millones ochocientos cincuenta y siete mil ciento cuarenta y dos dólares americanos con ochenta y cinco céntimos (US$ 1.142.857.142,85), así como el monto del pago también en dólares americanos, que eran: seiscientos millones de dólares americanos (US$ 600.000.000), siempre que se cancelase dentro de los primeros ciento ochenta días continuos siguientes al desembolso del primer abono del préstamo.

En tal sentido, se observa que en el primer contrato el monto en bolívares que fue establecido, fungió únicamente como moneda de cuenta, por lo cual ella fijó el quantum de la obligación. Si la moneda de cuenta se

27

hubiere establecido en divisas, ésta operaría como una obligación alternativa donde el deudor tendría la facultad de cumplir sus obligaciones en la moneda extranjera o en el equivalente en moneda de curso legal (C.C.Ven., artículo 1216). En estos casos tanto la moneda extranjera como la moneda de curso legal están *in obligationem*, pero una sola de ellas está *in solutionem*, ya que el deudor se libera entregando una sola de ellas (ya sea la moneda de curso o la moneda extranjera).

El Tribunal Supremo de Justicia ha sostenido sobre este aspecto, entre otras en decisión de la Sala de Casación Civil de fecha 14 de diciembre de 2017, en el expediente Nº AA20-C-2017-000596, lo siguiente:

> "...*El formalizante considera, entre otras cosas, que la recurrida sufre del vicio de errónea interpretación, por considerar determinante en la suerte del proceso que la única forma que tenía la deudora de liberarse de la obligación es entregando la suma en dólares de los Estados Unidos de América a la tasa de cambio oficial para la fecha del pago, sin reparar que este caso hay convención especial de pago en moneda extranjera como moneda de pago.*
>
> *Para corroborar lo denunciado conviene copiar lo pertinente:*
>
> "...*En     conclusión, en el caso     de autos, se evidencia que si bien es cierto para el momento en que se celebro (sic) el contrato de venta entre el cedente Diego Núñez Campos y     la demandada     MÉDICOS     UNIDOS LOS JABILLOS. C.A., no estaba vigente el régimen de restricciones cambiarias, no es menos cierto que existiendo el régimen cambiario de divisas imperante en nuestro país y que se encuentra restringido el libre tránsito de la moneda extranjera, así como de los convenios cambiarios celebrados entre la República Bolivariana de Venezuela y el Banco Central, los cuales son publicados en la Gaceta Oficial, no está prohibido que se realicen convenios en monedas extranjeras de conformidad con lo establecido en el artículo 115 de la Ley del Banco Central de Venezuela, pero el pago de esas deudas se puede hacer con el equivalente en bolívares (moneda de curso legal), calculado dicho equivalente a la tasa de cambio existente para el momento del pago. Y así se decide...".*
>
> *En el caso de autos, del contrato de venta que corre inserto en la pieza 1 del presente expediente (folios 35 al 40) se desprende lo siguiente:*

28

*"…El precio de venta de las acciones y de los equipos **será pagado por la compradora, en dólares, como moneda de cuenta y pago, con exclusión de cualquier otra moneda**…"*. (Resaltado de la Sala).

Por su parte el artículo 128 de la Ley del Banco Central de Venezuela, equivalente al artículo 115, de la ley del Banco Central de Venezuela vigente al momento de la interposición de la acción, especifica lo siguiente:

*"…**Los pagos estipulados en monedas extranjeras se cancelan, salvo convención especial**, con la entrega de lo equivalente en moneda de curso legal, al tipo de cambio corriente en el lugar de la fecha de pago…"*. (Resaltado de la Sala).

La Sala Constitucional, en sentencia N° 1641 del año 2011 indicó que cualquier tipo de obligación estipulada en moneda extranjera se puede pagar en moneda de curso legal al tipo de cambio vigente para el momento del pago y no para el momento cuando se haya causado la obligación:

*"…[las partes] pueden, directamente, establecer el pago en la moneda de curso oficial (bolívares) al deudor, la cual dado que la divisa funge de marco de referencia por ser ésta la requerida para el pago de la obligación, debe computarse a cambio oficial establecido para el momento del pago **y no para cuando la misma fue establecida**…"*.

La misma Sala Constitucional en sentencia N° 1188 del 16 de octubre de 2015, indicó que las obligaciones estipuladas en moneda extranjera antes del régimen de control de cambio se deben pagar en la moneda en que hayan sido pactadas. Señalándolo así:

*"…el precio se pactó en dicha moneda extranjera (…) sin que pueda liberarse (…) entregando el equivalente en moneda de curso legal a la demandante…"*.

Esta Sala, en acatamiento de lo dispuesto en el artículo 335 de la Constitución de la República Bolivariana de Venezuela, relativo a que las interpretaciones que establezca la Sala Constitucional sobre el contenido o alcance de las normas y principios constitucionales son vinculantes para las otras Salas del Tribunal Supremo de Justicia y demás tribunales de la República, acoge ese criterio.

Así pues, esta Sala en sentencia N° 987 de fecha 12 de diciembre de 2016, dejó sentado lo siguiente:

*"…Tal como claramente se desprende del texto de la cláusula Décima del contrato suscrito entre las partes hoy en litigio, **el pago fue establecido de manera exclusiva y excluyente de cualquier otra moneda, en dólares de los Estados Unidos de América**: mas, para el momento de la firma del*

29

contrato, 27 de septiembre de 2000, **no existía régimen de control cambiario y, las contrataciones podían hacerse en moneda extranjera**.

Esto dicho en otras palabras significa, que era perfectamente válida la contratación en moneda extranjera y, en el caso bajo análisis, tal contrato establece de manera exclusiva y excluyente de cualquier otra moneda, que el pago debe realizarse en dólares de los Estados Unidos de América, motivo por el cual, la referida moneda no fue usada como moneda de cuenta, sino más bien como moneda de pago, razón por lo cual, en el caso in comento, **la deudora sólo podrá liberarse de su obligación con el pagó en dólares de los Estados Unidos de América**, dado que para el momento de la suscripción del contrato se previó que cualquier disposición legal, reglamentaria, restricciones o limitaciones a la convertibilidad de la moneda venezolana, no afectaría las obligaciones asumidas en el contrato ni la moneda de pagó que en forma exclusiva contempló en el contrato.

(...Omissis...)

**Del transcrito se desprende que sí para el momento de la suscripción del contrato se expresó de manera exclusiva y excluyente, que el pago de las obligaciones lo sería en dólares de los Estados Unidos de América, el hecho de que posteriormente se haya instaurado un régimen de control cambiario, no exime a la intimada del pagó en dólares de los Estados Unidos de América, pues esa fue la moneda de pago prevista en el contrato,** cuya vigencia temporal inició el 27 de septiembre de 2000, época para lo cual la contratación en moneda extranjera era perfectamente viable...". (Resaltado de la Sala).

De acuerdo a la norma y a los criterios jurisprudenciales transcritos ut supra, **cuando el pago de cualquier tipo de obligación haya sido pactada mediante convención especial, en moneda extranjera**, antes de la entrada en vigencia del régimen de control de cambio, **es solo a través del pago en dicha moneda pactada como se cumple con la obligación adquirida**.

Si por el contrario la obligación en moneda extranjera fue pactada después de la entrada en vigencia del régimen de control de cambio, el pago se deberá realizar en bolívares al tipo de cambio vigente para el momento del pago **y no para cuando la obligación fue causada**.

Así pues, tenemos que el régimen de control de cambio entró en vigencia según Gaceta Oficial número N° 37.625 de fecha 5 de febrero de 2003 y la obligación que nos ocupa fue pactada en fecha 7 de junio de 2002, de donde se

30



*deduce que la obligación en análisis fue pactada antes de la entrada en vigencia del régimen de control de cambio.*

*En tal sentido, no cabe duda que la deuda pactada como moneda de pago entre las partes debía ser honrada en moneda extranjera (Dólares de los Estados Unidos de América), y no como señaló la recurrida, en una errónea exégesis del artículo 115 de la Ley del Banco Central de Venezuela, que dicha deuda "...se puede hacer con el equivalente en bolívares (moneda de curso legal), calculado dicho equivalente a la tasa de cambio existente para el momento del pago...", motivo por el cual será declarada con lugar la presente denuncia...".*

En consideración a todo lo expuesto, se evidencia que en nuestro territorio se pueden pactar las obligaciones en moneda extranjera como moneda de pago, para lo cual debe haber un pacto expreso que así lo establezca.

En éste sentido, se verifica de las actuaciones que el derecho de acreencia de la empresa RANTOR CAPITAL C.A., sobre la empresa PDVSA fue cedido por medio de contrato de cesión de crédito entre RANTOR y EATON GLOBAL SERVICES LIMITED, razón por la cual Petróleos de Venezuela, canceló un monto total de quinientos once millones novecientos trece mil doscientos setenta euros con setenta y cuatro céntimos (511.913.270,74) equivalentes a seiscientos millones de euros, apegándose a una cláusula de pronto pago, lo cual que todo lo cual se desprende del informe de experticia contable cursante a los folios uno (01) al veinte (20) de la pieza anexo 1, específicamente de las conclusiones contenidas en los puntos 7, 9 y 10.

Al respecto, debemos señalar que nuestro Código Civil permite la cesión de créditos, la cual es un negocio jurídico por el que se transmite de una persona a otra el derecho de crédito, por lo que produce la modificación de la obligación por la sustitución de la persona del acreedor.

31

Como refiere con claridad DOMÍNGUEZ GUILLÉN en su libro de Obligaciones, la Cesión de Créditos:

> *"...En un sentido amplio supone un negocio jurídico en virtud del cual un acreedor transmite su crédito a un tercero. Tal transmisión puede tener lugar a título oneroso (venta o permuta), a título gratuito (donación) o a título de garantía. El nuevo acreedor sustituye al anterior acreedor en la respectiva relación obligatoria.*
>
> *La doctrina reseña que en un sentido restringido la cesión de créditos es el contrato en virtud del cual el cedente se obliga a transferir un crédito al cesionario; constituye una especie del género del contrato de venta en cuanto no existan reglas específicas en materia de cesión de créditos"; o una especie dentro del género cesión de derechos. De allí se afirma que se trata de una modalidad de cesión de derechos consistente en la transmisión de un derecho de crédito de una persona a otra, no obstante la obligación sigue siendo la misma que era.*[1]

En el Código Civil Venezolano la referida figura se encuentra dispuesta de la siguiente manera:

> *"...Capítulo VII De la Cesión de Créditos u Otros Derechos*
>
> *Artículo 1.549.- La venta o cesión de un crédito, de un derecho o de una acción son perfectas, y el derecho cedido se transmite al cesionario, desde que haya convenio sobre el crédito o derecho cedido y el precio, aunque no se haya hecho tradición. La tradición se hace con la entrega del título que justifica el crédito o derecho cedido.*
>
> *Artículo 1.550.- El cesionario no tiene derecho contra terceros sino después que la cesión se ha notificado al deudor, o que éste la ha aceptado.*
>
> *Artículo 1.551.- El deudor queda válidamente libre si paga al cedente antes que por éste o por el cesionario se le haya notificado la cesión. Se exceptúan los documentos que llevan la aceptación explícita o implícita del deudor.*
>
> *Artículo 1.552.- La venta o cesión de un crédito comprende los accesorios de ese crédito, tales como las cauciones, privilegios o hipotecas.*

---

[1] Curso de Derecho Civil III, Obligaciones. Revista Venezolana de Legislación y Jurisprudencia C.A. Caracas, 2017.

*Artículo 1.553.- Quien cede un crédito u otro derecho responde de la existencia del crédito al tiempo de la cesión, a no ser que se haya cedido como dudoso o sin garantía.*

*Artículo 1.554.- El cedente no responde de la solvencia del deudor, sino cuando lo ha prometido expresamente, y sólo hasta el monto del precio que se le haya dado por el crédito cedido.*

*Artículo 1.555.- Cuando el cedente ha garantizado la solvencia del deudor y nada se ha convenido sobre la duración de esta responsabilidad, se presume haberla limitado a un año, a contar desde la época de la cesión del crédito, si el plazo de éste estaba ya vencido. Si el crédito es pagadero en un término que aún no está vencido, el año correrá desde el vencimiento. Si el crédito es de una renta perpetua, la responsabilidad de solvencia se extinguirá por el lapso de diez años, a partir de la fecha de la cesión.*

*Artículo 1.556.- Quien venda una herencia sin especificar los objetos de que se compone, no está obligado a garantir sino su calidad de heredero. Si se había aprovechado ya de los frutos de algún fundo o cobrado algún crédito perteneciente a la herencia, o vendido algunos efectos de la misma, está obligado a reembolsarlos al comprador, a menos que se los haya reservado expresamente en la venta. El comprador, por su parte, debe reembolsar al vendedor lo que éste haya pagado por las deudas y cargas de la herencia y abonarle lo que éste le deba, cuando no haya estipulación en contrario.*

*Artículo 1.557.- La cesión que hiciere alguno de los litigantes de los derechos que ventila a quien no es parte de la causa, después del acto de la contestación al fondo de la demanda y mientras no sea dictada sentencia definitivamente firme, no surte efectos sino entre el cedente y el cesionario. Sin embargo, cuando se haga constar en los autos que la parte contraria acepta la cesión, surtirá ésta inmediatos efectos contra aquélla, y en sustitución del cedente, se hará el cesionario parte en la causa.*

Sobre éste particular, observa esta juzgadora que la cesión realizada por la empresa RANTOR CAPITAL C.A. a EATON GLOBAL LIMITED SERVICES, del préstamo de siete mil doscientos millones de bolívares (7.200.000.000,00 Bs.) realizado a PDVSA, se encuentra adecuada a nuestro ordenamiento jurídico vigente, el cual como ya se indicó, permite la transferencia de la titularidad activa del crédito del acreedor actual (cedente) al nuevo acreedor (cesionario).

33

Así mismo, se verifica la disposición expresa de las partes en el contrato de préstamo entre PDVSA S.A. y RANTOR CAPITAL C.A. de fecha 14 de diciembre de 2014, mediante el cual se dispone claramente en sus cláusulas NOVENA y DECIMO OCTAVA que:

> "...CLAUSULA NOVENA: "PDVSA autoriza expresa e irrevocablemente las cesiones de los derechos originados en virtud del presente contrato, en razón de lo cual, el cesionario tendrá plenos derechos para ceder sus obligaciones frente a PDVSA, bastando la realización de una simple notificación."
> (...)
> CLAUSULA DECIMOCTAVA "...Sólo el prestamista podrá ceder o transferir sus derechos y obligaciones (en su totalidad o en parte) a un Cesionario Elegible..."

Pero además de lo ya expuesto, esta juzgadora ha revisado la normativa de rango sub legal aplicable en materia cambiaria, encontrando que en el Convenio Cambiario N° 9 de fecha 14 de julio de 2009[2], que regula lo referente a las divisas originadas por concepto de exportaciones de hidrocarburos, incluidos los hidrocarburos gascosos y otros, que Petróleos de Venezuela, S.A. y sus empresas filiales podrán utilizar los fondos en divisas colocados en el exterior para atender contratos que establezcan obligaciones de pago en moneda extranjera. Refieren tales artículos expresamente:

> **"Artículo 2.** Petróleos de Venezuela S.A. y sus empresas filiales no podrán mantener fondos en divisas por más de cuarenta y ocho (48) horas, salvo lo que corresponda a los fondos colocados en el exterior, hasta por el monto máximo que se determine, previa opinión favorable del Directorio del Banco Central de Venezuela, de acuerdo con las necesidades de las mismas y a lo establecido en la Ley, conforme a lo previsto en el artículo 113 de la Ley del Banco Central de Venezuela. Dichos fondos autorizados serán administrados libremente por sus titulares, por lo que estos podrán realizar las colocaciones que estimen convenientes a sus intereses.

---

[2] Publicado en la Gaceta Oficial de la República Bolivariana de Venezuela N° 39.239 de fecha 11 de agosto de 2009

34

***Artículo 3.****- Petróleos de Venezuela, S.A. y sus empresas filiales podrán utilizar los fondos a los que se refiere el artículo anterior, para atender contratos que establezcan obligaciones de pago en moneda extranjera, sólo por lo que respecta a la porción del mismo que corresponda a su componente externo..."* (Subrayado nuestro)

Todo lo cual encuentra pleno respaldo en lo dispuesto en el artículo 125 de la Ley del Banco Central de Venezuela, el cual establece que Petróleos de Venezuela S.A., o el ente creado para el manejo de la industria petrolera podrá mantener fondos en divisas con los ingresos producto de su actividad comercial, a los efectos del pago de sus compromisos financieros en el exterior. Señala el artículo lo siguiente:

> *"...****Artículo   125****.   Las   divisas   que   se   obtengan por   concepto   de exportaciones de hidrocarburos, gaseosos y otras, deben ser vendidas al Banco Central de Venezuela al tipo de cambio vigente para la fecha de cada operación, salvo aquellas que sean necesarias para cumplir con las contribuciones   fiscales   en   divisas   a   las   que   están obligados   de conformidad con la ley los sujetos autorizados para realizar las referidas actividades.*
>
> *Petróleos de Venezuela S.A., o el ente creado para el manejo de la industria petrolera, podrá mantener fondos en divisas, previa opinión favorable del Banco Central de Venezuela, a los efectos del pago de sus compromisos financieros en el exterior, así como para sufragar sus pagos operativos y de inversión en el extranjero, y a lo previsto en las leyes, lo que aparecerá reflejado en los balances de la   empresa.   Asimismo,   debe   informar   trimestralmente   o   a requerimiento del Banco Central de Venezuela sobre el uso y destino de los referidos fondos..."*

Por tanto, en criterio de este Tribunal, no hubo ninguna infracción al régimen cambiario en la operación realizada entre **PDVSA, RANTOR CAPITAL C.A.** y **EATON GLOBAL LIMITED SERVICES.** Advirtiendo también, tal como lo señalaron los expertos del Cuerpo de Investigaciones Científicas, Penales y Criminalísticas, que realizaron el Informe Pericial Contable en la presente causa, que el tipo de cambio aplicable fue el que

se encontraba vigente para la fecha del pago según el Banco Central de Venezuela, a saber: 6,30 Bs. por dólar.

Finalmente, esta Juzgadora verifica que el representante Fiscal ha señalado los numerales 1 y 2 del artículo 300 del Código Orgánico Procesal Penal para motivar su solicitud de sobreseimiento, manifestando específicamente en el petitorio lo siguiente *"...con fundamento en lo establecido en el artículo 300 numeral 1 primer supuesto y numeral 2 primer supuesto ejusdem, en virtud de que e**l hecho objeto del proceso no se realizó** y **los hechos no revisten carácter penal**."*

Respecto a ello, debe delimitarse que de lo cursante en el expediente se evidencia que la investigación fiscal estuvo dirigida a investigar lo relativo a la contratación de préstamo entre PDVSA y la empresa Rantor Capital C.A., de fecha 17 de diciembre de 2014, conforme a lo aludido en la denuncia interpuesta por el ciudadano **OSCAR ADOLFO RONDEROS**, cursante a los folios diecinueve (19) al veinticuatro (24) de la pieza N° 1, y no a lo denunciado por el ciudadano LUIS ALEJANDRO TELLERIAS, cursante al folio cuatro (04) de la misma pieza.

En base a este particular, y delimitando que los elementos traídos a la vista y consideración de ésta Juzgadora y lo analizado y evaluado por el representante Fiscal en su escrito de solicitud de sobreseimiento, están únicamente dirigidos a la ocurrencia de la contratación de préstamo mencionada en el extenso de la presente decisión, suscrito entre la empresa Petróleos de Venezuela S.A. y la empresa Rantor Capital C.A., debe delimitarse que el alcance de la presente decisión, solo se circunscribe a ello, y más aún tomando en consideración lo expuesto por el representante Fiscal al folio dos (02) de la presente pieza, donde manifiesta que se reserva el derecho de continuar con la investigación

respecto a lo denunciado por el ciudadano **LUIS ALEJANDRO TELLERÍA**, en su escrito de denuncia del 08 de marzo de 2017.

Por tanto, ésta Juzgadora considera procedente y ajustado en derecho declarar con lugar la solicitud efectuada por el profesional del derecho **FARIK KARIN MORA** en su carácter de Fiscal Provisorio Septuagésimo Séptimo (67°) Nacional con Competencia Plena del Ministerio Público, pero en base al numeral 2 del artículo 300 del Código Orgánico Procesal Penal, el cual establece "...*2. El hecho imputado no es típico...*", ya que evidentemente de la investigación se pudo determinar que la negociación señalada por el denunciante **OSCAR ADOLFO RONDEROS**, como una operación por siete mil doscientos millones de bolívares (7.200.000.000,00), por parte de PDVSA, efectivamente se realizó, sin embargo de la investigación se pudo determinar que la misma se efectuó bajo los parámetros administrativas y legales conforme a los documentos ut supra traídos a colación en el extenso de la presente decisión, como la experticia pericial contable emitida por la División de Experticias Financieras del Cuerpo de Investigaciones Científicas, Penales y Criminalísticas, así como informes emitidos por la consultoría jurídica de PDVSA. Así mismo, se logró determinar que en la referida negociación contractual, los ciudadanos **RAUL GORRIN y GUSTAVO PERDOMO** no tuvieron participación ni ostentaban participaciones en la empresa **RANTOR CAPITAL C.A.**.

Por ello, en base al principio del *Iura Novit Curia*, el cual supone al Juez como conocedor del derecho, es por lo que este Juzgado acoge el numeral 2 del artículo 300 del Código Orgánico Procesal Penal, para decretar el sobreseimiento de la presente causa.

En base a ello, resulta oportuno señalar que el Derecho Penal protege "*bienes jurídicos*", y únicamente operará cuando se ponga en

37

peligro o se lesionen tales intereses. En ello consiste el principio de lesividad, el cual se deriva de la concepción del Estado como un Estado social y democrático de Derecho.[3]

Ahora bien, la primera definición de bien jurídico, aplicada al modelo de un Estado social y democrático de Derecho, permite delimitar aquellos intereses **que el legislador debe proteger** por medio del Derecho penal. En este sentido, se ha dicho que únicamente han de considerarse bienes jurídicos aquellas **"condiciones de la vida social"**, en la medida en que afectan las **"posibilidades de participación de individuos en el sistema social"**; y, merecerán la protección penal y, en consecuencia, podrán tipificarse aquellas conductas que los lesionen, únicamente cuando tengan una **"importancia fundamental"**.[4]

Por su parte, la segunda definición de bien jurídico permite, en aquel modelo de Estado, interpretar los tipos penales de modo tal que **solamente puedan considerarse típicas aquellas conductas que lesionen o pongan en peligro un bien jurídico-penal**.

Desde esta perspectiva, el principio de lesividad aparece como un presupuesto de la imputación objetiva: únicamente podrán atribuirse a una conducta aquellas lesiones o puestas en peligro de bienes jurídico penales; en consecuencia, antes de preguntarse por las condiciones bajo las cuales una conducta es penalmente relevante, será menester saber si se lesiona un bien jurídico-penal. Si esto último no ocurre, deberá negarse la tipicidad sin tener que examinar el carácter riesgoso de la conducta.

Al respecto sostiene el Profesor Roxin[5], que:

---

[3]    Mir Puig, Santiago, Derecho Penal. Parte General, 8va. ed., B de F, Buenos Aires-Montevideo, 2008, p. 116-121; Cf. Binder, A., Introducción al Derecho penal, Ad-Hoc, Buenos Aires, 2004, pp. 159-171.

[4]    Ob. citada, p. 121.

[5] Roxin, Claus. Derecho Penal, Parte General, Civitas, Madrid, 2008.

> *"... aunque para la tipicidad es necesaria la lesión o puesta en peligro de un bien jurídico, no toda lesión o puesta en peligro de tales intereses determinará que el hecho es típico: en un Estado democrático ciertos actividades se consideran socialmente adecuadas y atípicas por la escasa peligrosidad de la conducta; o bien por la escasa gravedad de la lesión o por el contexto en que se produce; y otras, aunque no son socialmente aprobadas, son toleradas y, en consecuencia, consideradas penalmente irrelevantes. Nótese que en estos casos sí se lesiona un bien jurídico-penal, pero se considera que el Derecho penal no debe protegerlo contra tal conducta..."*

Como ya se indicó, la tipicidad consiste en la adecuación de un hecho a la previsión contenida en la ley penal, lo cual se relaciona íntimamente con la concepción que tiene el legislador respecto a los bienes jurídicos protegidos, ya que el ordenamiento jurídico penal regula como delitos, aquellos casos que se consideran especialmente lesivos de bienes jurídicos primordiales, esto con apego al principio de legalidad. Por ello, al examinar los hechos que han sido planteados y las circunstancias que los rodearon, se observa que no hubo afectación de intereses jurídicos penalmente relevantes.

Se entiende pues como delito, toda conducta u acción antijurídica efectuada por un sujeto activo, la cual vulnera una norma legal cuyo contenido dispone una sanción al transgresor a los fines de proteger un bien jurídico tutelado, así mismo, el autor HERNANDO GRISANTI AVELEDO en su obra "Lecciones de Derecho Penal, Parte General", explana que  *"...las acciones u omisiones previstas por la ley y castigadas por ella con una pena..."*, *"...El delito es un acto típicamente antijurídico, culpable e imputable a n hombre y castigado con una pena, más ampliamente castigado con una sanción penal."*.

Así mismo, conviene traer a colación lo explanado por el referido autor en relación a la ***tipicidad*** como uno de los elementos del delito *"...implica una relación de perfecta adecuación, de total conformidad entre un hecho de la vida real y algún tipo legal o tipo penal."*.

39

Ahora bien tomando en cuenta que la tipicidad es la adecuación de la conducta con los tipos amplificadores o con las figuras típicas descritas en las leyes sustantivas penales; **la atipicidad** viene a ser todo lo contrario, ya que si la acción u omisión ejecutada no tiene encuadramiento en algún tipo penal, se habla entonces de **atipicidad**, bien sea por inadecuación típica o ausencia de tipicidad, cuando esto ocurre procesalmente trae como consecuencia la terminación del proceso en la etapa preparatoria.

De manera que, por cuanto se observa que el hecho objeto del presente proceso y respecto  del cual el Ministerio Público solicitó el sobreseimiento, no lesiona ni pone en peligro bienes jurídicos estimados como relevantes por nuestro legislador, especificamente al no evidenciarse una lesión al patrimonio de la empresa Petróleos de Venezuela S.A. con la contratacion objeto de la investigación, esta Juzgadora concluye que los hechos no son típicos y por tanto debe decretarse el sobreseimiento.

Sobre esta causal de sobreseimiento, ha sostenido la Sala Constitucional del Tribunal Supremo de Justicia en decisión de fecha 3 de agosto 2007, producida en el  expediente N° 07-0800 y declarada VINCULANTE por la propia Sala, lo siguiente:

> "...Debe afirmarse que esta causal de sobreseimiento contempla a su vez cuatro supuestos sustancialmente diferentes entre sí, los cuales se corresponden con las categorías dogmáticas que componen el edificio conceptual de la teoría general del delito. En tal sentido, el legislador procesal penal ha dispuesto que el sobreseimiento procederá en los siguientes casos: 1.- Atipicidad del hecho; 2.- Ausencia de antijuricidad, lo cual se produce cuando concurre alguna de las causas de justificación previstas en el artículo 65 del Código Penal (legítima defensa, estado de necesidad, etc.); 3.- Inculpabilidad (casos de inimputabilidad, inexigibilidad de otra conducta, miedo insuperable y error de prohibición invencible); y 4.- Cuando la conducta, a pesar de ser típicamente antijurídica y culpable, no sea punible por razones político-criminales, lo cual sucede en los casos en que concurran

40

*excusas absolutorias o condiciones objetivas de punibilidad, como son por ejemplo, los supuestos contemplados en los artículos 481 y 380 del Código Penal, respectivamente.*

*Para precisar los alcances de la situación de atipicidad a la que hace mención el artículo 318.2 del Código Orgánico Procesal Penal, vale señalar que son varias las causas que pueden generarla. El supuesto básico en que ello ocurre es cuando el hecho no se encuentra tipificado en la legislación penal, es decir, que se trate de una figura punible inexistente en el ordenamiento jurídico venezolano, aun y cuando pueda estarlo en otra legislación, siendo que la excepción contenida en el artículo 28.4.c) del Código Orgánico Procesal Penal únicamente está referida a este primer supuesto de atipicidad, ello con base en una interpretación teleológica y sistemática de dicha norma procesal.*
*(…)*
*Sobre esta específica causal de sobreseimiento, JARQUE afirma lo siguiente:*

> *"La causal estudiada consiste en que, estando perfectamente determinado el hecho que motivara el inicio de la investigación –y ello, como condición sine qua non para su viabilidad-, <u>el mismo no se encuentra previsto en el ordenamiento jurídico como conducta sujeta a sanción penal</u>.*
> *La necesariedad de una clara determinación del hecho, resulta extensiva a todos los aspectos vinculados con el presunto delito, desde su efectiva consumación o una eventual tentativa, hasta los distintos grados de participación y demás circunstancias atinentes al imputado, que –según la figura de que se trate- pueden incidir en la efectiva tipificación penal.*
> *(…)*
> *<u>Asimismo, la atipicidad debe responder al cotejo del hecho en cuestión con la totalidad de las disposiciones penales del ordenamiento jurídico en su conjunto, vale decir que la conducta no puede estar contemplada como delictiva ni en el Código Penal, ni en sus leyes complementarias, ni en las demás normas penales insertadas en leyes comunes</u>" (JARQUE, Gabriel Darío. El sobreseimiento en el proceso penal. Editorial Depalma. Buenos Aires, 1997, pp. 27 y 28) (Subrayado del presente fallo)."*

En éste sentido, evidencia esta Juzgadora que la contratación objeto de la presente investigación, no fue efectuada contrariando procedimientos administrativos y disposiciones legales según los elementos de convicción e informes que corren insertos en las actuaciones, por lo tanto, no puede delimitarse la existencia de conducta delictiva ni pueden subsumirse los hechos dentro de un tipo penal en especifico.

41

Por lo tanto, en vista de las circunstancias de hecho y de derecho aquí planteadas, lo evaluado del escrito de solicitud de sobreseimiento suscrito por el representante Fiscal, así como de lo evidenciado de los documentos que corren insertos en el presente expediente, es por lo que esta Juzgadora considera procedente y ajustado a derecho declarar **CON LUGAR** la solicitud Fiscal y en consecuencia decretar el **SOBRESEIMIENTO** de la presente causa de conformidad con lo dispuesto en el numeral 2 del artículo 300 del Código Orgánico Procesal Penal. Y así se decide.

### III
### DISPOSITIVA

Por todos los razonamientos de hecho y de derecho anteriormente expuestos, este Juzgado Undécimo (11º) de Primera instancia en Funciones de Control del Circuito Judicial Penal del Área Metropolitana de Caracas, administrando Justicia en nombre de la República Bolivariana de Venezuela y por autoridad de la ley, emite los siguientes pronunciamientos:

**PRIMERO**: **SE DECLARA CON LUGAR** la solicitud efectuada por el profesional del derecho **FARIK KARIN MORA SALCEDO,** en su carácter de Fiscal Provisorio Sexagésimo Séptimo (67º) a Nivel Nacional con Competencia Plena del Ministerio Público y en consecuencia se decreta el **SOBRESEIMIENTO** de la presente causa de conformidad con lo dispuesto en el numeral 2 del artículo 300 del Código Orgánico Procesal Penal, el cual establece que "....*El sobreseimiento procede cuando: 2. El hecho imputado no es típico...*", en favor de los ciudadanos **VICTOR EDUARDO AULAR BLANCO**, titular de la cédula de identidad Nro. V-6.835.572, **RAUL ANTONIO GORRIN**, titular de la cédula de identidad Nro. V-8.682.996, **GUSTAVO PERDOMO**, titular de la cédula de identidad Nro.

42

V-14.585.388, y de los ciudadanos **JOSE MANUEL CERRO**, numero de pasaporte E-13588986 y **MARCEL OREJANU**, portador del pasaporte Nro. BC082490, en su carácter de Directores Generales de la empresa **RANTOR CAPITAL, C.A**.

**SEGUNDO**: En consecuencia, se **ORDENA** el cese de cualquier medida de carácter personal o real que pese sobre los referidos ciudadanos, respecto a los hechos sobre los cuales recae la presente decisión, de conformidad con lo dispuesto en el artículo 301 del Código Orgánico Procesal Penal.

**TERCERO**: De conformidad con lo dispuesto en el artículo 98 de la Ley Orgánica de la Procuraduría General de la República, se **ORDENA LA NOTIFICACIÓN DE LA PRESENTE DECISIÓN A LA PROCURADURIA GENERAL DE LA REPÚBLICA**.

Regístrese la presente decisión, notifiquese a las partes y oficiese lo conducente, a los fines legales consiguientes. **CÚMPLASE**.

**LA JUEZ (E)**

**DRA. LUISA ROMERO**

**SECRETARIA**

**ABG. EVA DAYANA FERREIRA**

**EXP: 17.670-20**
**ED/LARC**

43